UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
NEW JERSEY CARPENTERS HEALTH FUND,           :
NEW JERSEY CARPENTERS VACATION FUND          :
And BOILERMAKER BLACKSMITH NATIONAL          :
PENSION TRUST, on Behalf of Themselves and All :
Others Similarly Situated,                    :
                                              :
                        Plaintiffs,           :
                                              :         08 CV 8781 (HB)
          - against -                         :
                                              :         OPINION &
RESIDENTIAL CAPITAL, LLC, RESIDENTIAL         :         ORDER
FUNDING, LLC, RESIDENTIAL ACCREDITED          :
LOANS, INC., BRUCE J. PARADIS, KENNETH M.     :
DUNCAN, DAVEE L. OLSON, RALPH T. FLEES,       :
LISA R. LUNDSTEN, JAMES G. JONES, DAVID M.    :
BRICKER, JAMES N. YOUNG, RESIDENTIAL          :
FUNDING SECURITIES CORPORATION d/b/a          :
GMAC RFC SECURITIES, GOLDMAN, SACHS &         :
CO., RBS SECURITIES, INC., d/b/a RBS          :
GREENWICH CAPITAL, DEUTSCHE BANK              :
SECURITIES, INC., CITIGROUP GLOBAL            :
MARKETS, INC., CREDIT SUISSE SECURITIES       :
(USA) LLC, BANK OF AMERICA CORPORATION        :
as successor-in-interest to MERRILL LYNCH,    :
PIERCE, FENNER & SMITH, INC., UBS             :
SECURITIES, LLC, JPMORGAN CHASE, INC.         :
as successor-in-interest to BEAR, STEARNS & CO., :
INC., and MORGAN STANLEY & CO., INC.,         :
                                              :
                        Defendants.           :
                                              :
------------------------------------------------------------------------x

**Hon. Harold Baer, Jr., District Judge:**

      Lead Plaintiffs New Jersey Carpenters Vacation Fund ("Carpenters Vacation Fund"), New Jersey Carpenters Health Fund ("Carpenters Health Fund") and Boilermaker Blacksmith National Pension Trust ("Boilermaker Trust") (collectively "Lead Plaintiffs" or "Plaintiffs") bring claims under sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k(a), 77*l*(a)(2) (2010), for alleged omissions and misstatements in publicly-filed registration statements and prospectuses of mortgage-backed securities known as the RALI Certificates. The RALI Certificates were issued in a series of fifty-nine different offerings from March 2006 to

1

October 2007, each with its own prospectus supplement but traceable to two primary "shelf" registration statements. Plaintiffs bring suit against essentially two groups of defendants, the "RALI Defendants," who were the primary issuers, sponsors and sellers of the RALI Securities, and the "Underwriter Defendants," corporate entities who underwrote the RALI offerings. For the reasons that follow, Plaintiffs' claims related to the offerings they did not purchased are dismissed for lack of standing. Claims related to alleged conflicts of interest with rating agencies and allegedly outdated credit ratings and inadequate credit enhancement are dismissed for failure to state an actionable claim under the Securities Act. Claims related to the alleged disregard of underwriting guidelines may proceed.

## I.   FACTUAL BACKGROUND[1]

Plaintiffs are three pension funds, who purport to represent a class who purchased or acquired interests in mortgage-backed securities known as the RALI Mortgage Asset-Backed Pass-Through Certificates ("RALI Certificates" or "RALI Securities"), which were registered pursuant or traceable to two registration statements and accompanying prospectuses filed with the SEC on March 3, 2006, and on April 3, 2007. Consol. First. Am. Secs. Class Action Compl. ("Consolidated Amended Complaint" or "CAC") ¶¶ 1, 19-20. There are essentially two sets of defendants (collectively "Defendants"). The "RALI Defendants" are made up of the corporate entities that issued, sponsored and sold the RALI Certificates[2], as well as various individual defendants ("Individual Defendants") who signed the two registration statements filed with the SEC for the RALI Certificates.[3] *See* CAC ¶¶ 2, 4, 21-37. Plaintiffs also bring claims against the "Underwriter Defendants," made up of the corporate entities who underwrote the fifty-nine RALI Securities offerings.[4] *See* CAC ¶¶ 2, 4, 40-52.

Mortgage-backed securities ("MBS") are defined as "where mortgage loans are acquired, pooled together, and then sold to investors [in the form of a security], who acquire rights in the

---

[1] The following facts are taken from the Consolidated Amended Complaint, the factual allegations of which are accepted as true for purposes of Defendants' motion to dismiss, as well as from public filings referenced and relied upon in the Amended Complaint and public information of which the court may take judicial notice.
[2] Defendants Residential Accredited Loans, Inc., Residential Capital LLC, Residential Funding Company, LLC, and Residential Capital Corporation.
[3] Defendants Bruce J. Paradis, Kenneth M. Duncan, Davee L. Olson, Ralph T. Flees, Lisa R. Lundsten, James G. Jones, David M. Bricker, and James N. Young.
[4] Defendants Residential Funding Securities Corporation d/b/a GMAC RFC Securities, Goldman, Sachs & Co., Inc., RBS Securities, Inc. f/k/a Greenwich Capital Markets, Inc. d/b/a RBS Greenwich Capital, Deutsche Bank Securities, Inc., Citigroup Global Markets, Inc., Credit Suisse Securities (USA) LLC, Merrill Lynch, Pierce, Fenner & Smith, Inc., UBS Securities, LLC, Bear, Stearns & Co., Inc., and Morgan Stanley & Co., Inc.

income flowing from the mortgage pools." CAC ¶ 56. The securities are often divided into groups ("tranches") based on the relative riskiness of the underlying loans, the order in which the Certificates are paid out, and their corresponding interest rates. *See* CAC ¶ 57. Due to the varying levels of risk associated with the loans and the potential that a borrower may default or be delinquent, a MBS may be created with a degree of "credit enhancement" built into its structure to protect from that risk. *See* CAC ¶ 93-94. The issuance of these securities can be done in one or more offerings based on a single "shelf" registration statement. *See* SEC Rule 415: Delayed or continuous offering and sale of securities, 17 C.F.R. § 230.415(1)(vii) (2010).[5]

According to Plaintiffs, the RALI Defendants derived their profit through the sale of the RALI Certificates at an excess of the purchase price they paid for the underlying mortgages used to create the MBS. CAC ¶ 63. The RALI Defendants would purchase the underlying loans in bulk "directly from its loan origination affiliate," Homecomings Financial LLC f/k/a Homecomings Financial Network, Inc. ("HFN"). CAC ¶¶ 6, 64. The loan collateral was then securitized and sold to investors in the form of certificates, whose value was dependent on the payment of the underlying loans. *See* CAC ¶ 6. The Underwriter Defendants helped craft the securitization structure, draft and disseminate the related registration statements and prospectuses, and sell the RALI Securities to investors. *See, e.g.,* CAC ¶ 41. Rating agencies provided the credit rating for each certificate based on the value and risks of the loan collateral, and according to Plaintiffs, played a significant role in the structuring of the RALI Securities, "from reviewing the loan tape before the loans were acquired to determining the loans to be included in the underlying Certificate collateral pools." CAC ¶ 65. As part of this process, the Defendants would engage in "ratings shopping," where they would seek a preliminary quote on the rating and necessary credit enhancement of a securitization, negotiate the details of the deal structure with the agencies, and ultimately select the agency that provided the highest rating for the most certificates in the securitization with the least amount of costly credit enhancement. *See,e.g.*, CAC ¶¶ 14, 65.

The RALI Certificates are made up of mortgage collateral purchased principally from HFN. CAC ¶ 73. Many, if not most, of the underlying loans were some form of sub-prime or otherwise risky "low documentation" or "no documentation" loans where there was a higher risk

---

[5] "Securities may be registered for an offering to be made on a continuous or delayed basis in the future, *Provided*, That…The registration statement pertains only to…Mortgage related securities, including such securities as mortgage backed debt and mortgage participation or pass through certificates."

of default based on weak credit history and personal finances, or fraud because the borrower either self-reported or was not required to disclose as much information as in a typical loan. *See,* CAC ¶¶ 5, 64. The certificates were sold in fifty-nine separate offerings between March 28, 2006 and October 9, 2007. CAC ¶ 2. Collectively, $37.66 billion of RALI mortgage backed securities were sold to Plaintiffs and the purported class. *Id.* The Certificates were filed pursuant to two registration statements, each of which contained a base prospectus, along with subsequently filed prospectus supplements (collectively the "Offering Documents") for each particular RALI offering. CAC ¶¶ 1, 2. The registration statements and prospectus supplements contained detailed information about the securitization and the underlying loan pools.

When they were issued, most of the RALI Certificates received high credit ratings – Moody's assigned its highest investment grade rating of "Aaa" to 95.80% of the certificates that it rated, while Standard & Poor's assigned its highest investment grade rating of "AAA" to 95.60% of the certificates it reviewed. CAC ¶ 8. "None of the Certificates were initially rated below investment grade." *Id.* Shortly thereafter, however, defaults and delinquencies on the underlying mortgage collateral rapidly developed. CAC ¶ 67-68. As a result, the RALI Certificates have lost "on average 42% of their value." CAC ¶ 9. Over 38% of the underlying loans of the RALI offerings are delinquent, or in default, foreclosure or bankruptcy. *Id.* In mid-2007, the rating agencies revised their rating models, re-analyzed the Certificates, and downgraded almost all of them. CAC ¶ 72. More than 98% of the RALI Certificates have been downgraded to "junk" quality. *Id.* One can't help but wonder what if any due diligence the rating agencies practiced.Plaintiffs allege that the Defendants[6] violated section 11 of the Securities Act based on omissions and misstatements of material information from the two registration statements and various prospectus supplements for the RALI Securities offerings. CAC ¶¶ 262-76. They further allege that the Underwriter Defendants violated Section 12(a)(2) of the Securities Act based on material misstatements and omissions in the prospectus supplements. CAC ¶¶ 277-85. Finally, Plaintiffs bring a cause of action under Section 15 of the Securities Act against the Individual Defendants and Underwriter Defendants for "control person liability." CAC ¶¶ 286-94. Plaintiffs' group their allegations of omitted and misstated information into three basic categories: (1) the underwriting guidelines used to originate the underlying loans were "systematically disregarded" by the originator, *see, e.g.,* CAC ¶¶ 205-32

---

[6] Specifically, RALI, the Individual Defendants, and the Underwriter Defendants. CAC ¶¶ 262-76.

(2) the credit enhancements built into the RALI Certificates were "inadequate" and the model for credit rating was "outdated," *see, e.g.,* CAC ¶¶ 113-21 and (3) there were undisclosed conflicts of interests between the Defendants and rating agencies, *see, e.g.,* CAC ¶¶ 117-27; *see also* Pls.' Mem. of Law in Opp. to the RALI Defs.' Mot. to Dismiss ("Pls.' RALI Mem.") at 4.  The allegations and arguments raised in this case are very similar to those raised in a previous case before me brought by some of the same plaintiffs, *New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Group, PLC*, No. 08 CV 5093(HB), 2010 WL 1172694 (S.D.N.Y. Mar. 26, 2010).  Although this case is considered on its own merits, many of the legal issues are explored in greater detail in the *Royal Bank of Scotland* opinion.

## II. DISCUSSION
### A. Legal Standard

A complaint will be dismissed under Rule 12(b)(6) if there is a "failure to state a claim upon which relief can be granted." Fed.R.Civ.P.12(b)(6).  To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must "plead enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Landmen Partners Inc. v. Blackstone Group, L.P.*, 659 F.Supp.2d 532, 538 (S.D.N.Y. 2009).  A facially plausible claim is one where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).  Where the court finds well-pleaded factual allegations, it should assume their veracity and determine whether they "plausibly give rise to an entitlement to relief." *Id.* at 1950.  "Bald contentions, unsupported characterizations, and legal conclusions are not well-pleaded allegations and will not defeat the motion." *Garber*, 537 F.Supp.2d 597, 610 (S.D.N.Y. 2008).  In addition to well-pleaded factual allegations in the complaint, a court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *In re Morgan Stanley Tech. Fund Secs. Litig.*, Nos. 02 Civ. 6153, 02 Civ. 8579 (BSJ), 2009 WL 256005 (S.D.N.Y. Feb. 2, 2009)(applying *ATSI* to Securities Act claims), *aff'd*, 592 F.3d 347 (2d Cir. 2010).

Claims premised on fraud, including claims brought under the Securities Act, must satisfy the heightened particularity requirements of Rule 9(b) of the Federal Rules of Civil Procedure, whereas Securities Act claims that "sound in negligence" are governed by the standard notice pleading requirements of Rule 8. *See In re Morgan Stanley Info. Fund Secs. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010). Defendants argue that Plaintiffs' claims sound in fraud, but Plaintiffs expressly disclaim any allegations of fraud, and their allegations focus on the alleged negligent omission of information. *See Landmen Partners*, 659 F.Supp.2d at 539, n.5 ("Plaintiff's allegations in this case clearly sound in negligence and not fraud.").

### B. Standing

Named plaintiffs allegedly purchased RALI Certificates in four offerings, each traceable to the 2006 and 2007 registration statements. CAC ¶¶ 19-20. Defendants argue that Plaintiffs lack standing for the other fifty-five offerings because they did not purchase those securities, and therefore could not be harmed by any misleading statement or omission in the related documents. Standing is challenged on the basis of the pleadings, and a district court must "accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *W.R. Huff Asset Mgmt Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008). In a putative class action, "**named** plaintiffs…must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Id.* at 106 n.5 (internal quotations omitted, emphasis in original). To demonstrate Article III standing, Plaintiffs must allege (1) injury in fact, a "concrete and particularized harm to a legally protected interest;" (2) causation, a "fairly traceable connection between the asserted injury-in-fact and the alleged actions of the defendants," and; (3) redressability – "a nonspeculative likelihood that the injury can be remedied by the requested relief." *Id.* at 106-07 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Section 11 does not create any obligation to allege damages but a plaintiff "must nevertheless satisfy the court that she has suffered a cognizable injury under the statute." *In re AOL Time Warner, Inc. Secs. and "ERISA" Litig.*, 381 F.Supp.2d 192, 246 (S.D.N.Y. 2004) (internal citations omitted); *see also In re Refco, Inc. Secs. Litig.*, 503 F.Supp.2d 611, 634 (S.D.N.Y. 2007).

Plaintiffs were not harmed by alleged misstatements and omissions related to the fifty-five offerings that they did not purchase. Plaintiffs' allegations are largely related to the details contained in the distinct prospectus supplements for each of the offerings: the description of the particular underwriting guidelines, the delinquency rates, the credit enhancements, and the loan-to-value ratios all differed based on the particular offering. *See, e.g.,* CAC ¶¶ 219-47. As the Plaintiffs themselves highlight when they state that the different names for the offerings "reflected the different types of mortgage collateral underlying each specific RALI Offering[]," CAC ¶ 64, the underlying loans might have similar defects but are not actually the same. As such, the harm claimed by Plaintiffs due to the alleged misstatements in the Offering Documents for the RALI Certificates that they purchased has little bearing on any potential harm suffered by an unnamed party from misstatements in the Offering Documents from Certificates that they did not purchase. As noted in more detail in *Royal Bank of Scotland*, 2010 WL 1172694, at *7-8, courts in the Second Circuit and elsewhere have similarly concluded that a plaintiff must have purchased in the particular offering in order to have standing to challenge related material misstatements and omissions. *See, e.g., In re Salomon Smith Barney Mutual Fund Fees Litigation*, 441 F. Supp. 2d 579, 607 (S.D.N.Y. 2006) (named plaintiffs in a putative class action "who own shares in twenty of the eighty-eight mutual funds offered" did not have standing to bring suit based on the other sixty-eight mutual fund offerings) (providing list of similar decisions in other federal jurisdictions); *In re Lehman Brothers Secs. and ERISA Litig.*, No. 09 MD 2017 (LAK), 2010 WL 545992, at *3(S.D.N.Y. Feb. 17, 2010) ("Named plaintiffs have purchased in nine of the ninety-four offerings…They have not alleged any personal injury stemming from the other eighty-five…They therefore have no standing to assert those claims."). Indeed, the decision in *Lehman Brothers* involved markedly similar allegations with regard to underwriting guidelines, the inadequacy of the credit enhancements, and conflicts of interest with the rating agencies, and the same failure to purchase from all of the offerings for which they allege to have standing. *Lehman Brothers*, No. 09 MD 2017 (LAK), 2010 WL 545992, at *1.. As alleged, Plaintiffs' claims related to the fifty-five offerings that they did not acquire an interest in, must be dismissed for lack of standing.

### C. Failure to Allege Actionable Omissions Under Section 11 and 12(a)(2)

Defendants also argue that Plaintiffs failed to state actionable omissions or misstatements under sections 11 or 12(a)(2). To state a claim under section 11, Plaintiffs must allege that they (1) purchased a registered security either from the issuer or in the aftermarket; (2) Defendants participated in the offering in manner sufficient to give rise to liability under section 11 and; (3) the registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a); *Morgan Stanley*, 592 F.3d at 358-59. Section 12(a)(2) "provides similar redress" to section 11 claims, "where the securities at issue were sold using prospectuses or oral communications that contain material misstatements or omissions." 15 U.S.C. § 77*l*(a)(2); *Morgan Stanley*, 592 F.3d at 359. "Issuers are subject to 'virtually absolute' liability under section 11, while the remaining potential defendants under sections 11 and 12(a)(2) may be held liable for mere negligence." *Morgan Stanley*, 592 F.3d at 359 (quoting *Huddleston,* 459 U.S. at 382). Under section 11 and 12(a)(2) plaintiffs "need not allege scienter, reliance, or loss causation." *Id*. The analysis of claims made pursuant to section 11 and section 12(a)(2) is essentially the same. *See, e.g., Landmen Partners*, 659 F.Supp.2d at 539 n.6 ("Claims under Sections 11 and 12 are usually evaluated in tandem because if a plaintiff fails to plead a cognizable Section 11 claim, he or she will be unable to plead one under Section 12(a).") (internal quotations omitted); *Rubin v. MF Global, Ltd.*, 634 F.Supp.2d 459, 466 (S.D.N.Y. 2009) ("A plaintiff who fails to plead a § 11 claim necessarily fails to plead a § 12(a)(2) claim as well.").

For a misstatement or omission to be actionable under sections 11 or 12(a)(2), Defendants must have a duty to disclose, and the omitted or misstated info must be material to the investor. A duty to disclose exists where the offering documents contain: "(1) a misrepresentation; (2) an omission in contravention of an affirmative legal disclosure obligation; [or] (3) an omission of information that is necessary to prevent existing disclosures from being misleading." *Morgan Stanley*, 592 F.3d at 360; *see* 15 U.S.C. §§ 77k(a), 77*l*(a)(2). Plaintiffs must also demonstrate that the alleged omission or misstatement is material, or "whether the defendants representations, taken together and in context, would have misled a reasonable investor." *Morgan Stanley*, 592 F.3d at 360; *see also DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003). Materiality is an objective question, taken from the perspective of a

8

reasonable investor and based on a reading of the offering documents as a whole.  *See TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 445 (1976); *DeMaria*, 318 F.3d at 180.  The "total mix" of information to consider for materiality includes "information already in the public domain and facts known or reasonably available to the shareholders."  *Garber v. Legg Mason, Inc.*, No. 08-1831-cv, 2009 WL 3109914, at *2 (2d Cir. Sept. 30, 2009) (quoting *United Paperworkers Int'l Union v. Int'l Paper Co.,* 985 F.2d 1190, 1199 (2d Cir.1993)).

        **1.**  *Mortgage Originator Underwriting Guidelines*

Plaintiffs' first set of allegations are related to the stated loan underwriting guidelines described in the Offering Documents.  Plaintiffs allege that, contrary to the descriptions of the underwriting practices in the Offering Documents, the mortgage originator for the RALI Securities "systematically disregarded" the underwriting guidelines.  Pls.' RALI Mem., at 4.  They highlight a series of specific underlying factual allegations to support this inference, such as credit rating downgrades, a rapid increase in delinquency rates, and the allegedly "faulty" due diligence of the mortgage originator.  Defendants argue that none of the underlying facts they point to were actually misleading or omitted, and that Plaintiffs therefore fail to state a claim.

First, Defendants argument that the information was disclosed and otherwise had no further duty to disclose based on SEC Regulation AB, 17 C.F.R. § 229.1111, are not persuasive for essentially the same reasons laid out in detail in *Royal Bank of Scotland*.  *See* 2010 WL 1172694, at *10-11.  The SEC Regulation is not applicable because Plaintiffs allege affirmative misstatements, that the stated guidelines were not actually followed, in addition to omissions.  Further, because they allege that the guidelines were "systematically disregarded," the alleged misstatements and omissions are not cured by the risk disclosures Defendants point to in the Offering Documents.

Second, in *Royal Bank of Scotland*, I upheld a similar claim based on allegations that the underwriting guidelines were disregarded, and therefore any of the statements in the Offering Documents about those guidelines were misleading.  *See* 2010 WL 1172694, at *12-13.  The allegations are nearly the same, and Plaintiffs in this case likewise state an actionable claim.  There, I determined that "Plaintiffs provide a credible inference that originators of these underlying loan pools systematically disregarded underwriting guidelines" because of "widespread evidence" of this activity by the originator along with the fact that "the loan pools provided by those same originators failed at considerable levels."  *Id.* at 13..  Similarly, here,

9

Plaintiffs link their allegations about the failures of the underlying loan pools to allegations that the mortgage originator disregarded underwriting guidelines. *See Morgan Stanley*, 592 F.3d at 364. Plaintiffs highlight that (1) the FTC investigated HFN's underwriting practices as it related to potential improper differences in underwriting based on race; (2) details of aggressive loan underwriting practices described by a former HFN employee, such as where loan officers deliberately hid certain loan provisions from potential borrowers; and (3) HFN was investigated by the West Virginia Attorney General for "predatory lending practices." *See* CAC ¶¶ 73-79. Similar to *Royal Bank of Scotland*, these factual allegations about HFN's improper underwriting practices coupled with the loan pools' near-total credit rating collapse and default rate spike are sufficient to create a fair inference that HFN totally disregarded the underwriting guidelines, contrary to what was stated in the Offering Documents. *See* 2010 WL 1172694, at *13; *see also Lehman*, No. 09 MD 2017 (LAK), 2010 WL 545992, at *5 (similar underwriting guideline allegations "are sufficient at this stage to support a reasonable inference that the Offering Documents' description of the underwriting guidelines was materially misleading").

### 2.  *Outdated Modeling and Inadequate Credit Enhancement Omissions*

Plaintiffs' next set of allegations, the Offering Documents failed to disclose that the credit rating model was outdated and the credit enhancements were inadequate, are not actionable. *See Royal Bank of Scotland*, 2010 WL 1172694, at *13-14. The Offering Documents bespoke caution about the credit ratings and credit enhancements, as it disclosed the risks of relying on ratings and also specifically mentioned the potential inadequacy of credit enhancement. *See Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996) (disclosures "warn investors of exactly the risk the plaintiffs claim [were] not disclosed."); *see also Halperin*, 295 F.3d at 361 (no omission where "disclosed or implied in the offering documents"). Since the disclosures warned of the risks related to these alleged misstatements and omissions, "it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering." *In re Flag Telecom Holdings, Ltd. Secs. Litig.*, 618 F.Supp.2d 311, 322 (S.D.N.Y. 2009) (quoting *Halperin,* 295 F.3d at 357 (2d Cir. 2002)). Plaintiffs' allegations are otherwise pleading by hindsight. There is no allegation that these offerings did not receive the stated credit rating or credit enhancements detailed in the Offering Documents, and Plaintiffs only allege that the rating agencies revised their models at a later date, and that the credit enhancements were shown to be inadequate after the offering.

10

There is no factual allegation that indicates the ratings and credit enhancements described in the documents were incorrect at the time offered. "The veracity of a registration statement is determined by assessing the facts as they existed when the statement became effective." *Landmen Partners*, 659 F.Supp.2d at 539; *see also In re Agria Corp. Secs. Litig.*, 08 Civ. 3536 (WHP), 2009 WL 4276967, at *5 (S.D.N.Y. Nov. 30, 2009) ("The truth of a statement made in the prospectus is adjudged by the facts as they existed when the registration statement became effective.") (quoting *In re Flag Telecom Holdings Ltd. Sec. Litig.,* 308 F.Supp.2d 249, 254 (S.D.N.Y.2004)). Finally, credit ratings and the adequacy of credit enhancements are clearly opinion statements because they predict future value and reliability, and are not actionable unless it is alleged that the opinions were not truly held. *See Panther Partners*, 538 F.Supp.2d at 668 ("[A]ccurate statements of historical fact and statements of opinion, including statements of hope, opinion, or belief about…future performance or general market conditions are non-actionable.") (internal quotations omitted); *In re AOL Time Warner, Inc. Secs. and "ERISA" Litig.*, 381 F.Supp.2d 192, 243 (S.D.N.Y. 2004) (opinion is an actionable misstatement if "the opinion is both (1) not believed by the speaker and (2) objectively untrue.")(citing *Va. Bankshares*, 501 U.S. at 1092-96). Plaintiffs' allegations that the ratings were outdated and the credit enhancements inadequate are not actionable.

### 3. *Conflict of Interest Omissions*

Finally, Plaintiffs' allegations that the Defendants omitted disclosure of material conflicts of interest with rating agencies cannot succeed because Defendants had no duty to disclose this information. Documents provided by Defendants demonstrate that these conflicts were publicly known. "Sections 11 and 12(a)(2) do not require the disclosure of publicly available information." *Landmen Partners*, 659 F.Supp.2d 532 at 545; *see also Garber*, 537 F.Supp.2d at 611-12 (no duty to disclose departure of key employee where it was "already publicly reported in several news articles"). Conflicts of interest between rating agencies and underwriters due to the pay structure was known, considered, and published in SEC reports from at least 2003. *See* Decl. of Shahzeb Lari ("Lari Decl."), Ex. 13 (SEC, *Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Markets* (2003)). There were also a number of trade journal and other press articles that discussed rating agency payment by investment banks. As I stated in *Royal Bank of Scotland*, "A reasonable investor would be expected to know that the rating agencies were paid by the investment banks that hired them, and that they had a

11

hand in determining the structure of securitizations." 2010 WL 1172694, at *14.  Plaintiffs have failed to demonstrate a duty to disclose the alleged misstatements because they were already publicly-known.  *See Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002) ("Disclosure of an item of information is not required, however, simply because it may be relevant or of interest to a reasonable investor…to be actionable, the securities laws must impose a duty to disclose the omitted information."); *see also Seibert v. Sperry Rand Corp.,* 586 F.2d 949, 952 (2d Cir. 1978) ("Although the underlying philosophy of federal securities regulations is that of full disclosure, there is no duty to disclose information to one who reasonably should already be aware of it.") (internal citations omitted).

### D. Control Person Liability

To state a cause of action for control person liability under section 15, 15 U.S.C. § 77*o*, a plaintiff must allege (1) a primary violation of the Securities Act and (2) "control" by the defendant.  *See Rombach*, 355 F.3d at 178.  The RALI Defendants, along with Residential Securities Funding Corporation, an underwriter that is a subsidiary of Residential Capital Corporation, only argue that section 15 liability fails because there is no primary liability.  Since Plaintiffs have sufficiently alleged a primary violation, this argument fails.  The Underwriter Defendants, other than Residential Securities Funding Corporation, argue that Plaintiffs have failed to sufficiently allege that they had control.  Although Plaintiffs make a number of assertions about the influence and participation of these separate companies, they do not sufficiently allege that they actually had control over the RALI issuing enterprises.  *See In re Flag Telecom Holdings, Ltd. Secs. Litig.*, 352 F.Supp.2d 429, 458 (S.D.N.Y. 2005).  "Control in this context is not the mere ability to persuade, but almost always means the practical ability to *direct* the actions of people who issue or sell securities." *Id.* (internal quotations omitted).  The allegations here are insufficient to hold underwriters that are distinct, non-subsidiary banks liable as control persons of the Residential Capital companies that securitized and issued the RALI Securities.

### E. Leave to Replead

Plaintiffs' request for leave to replead is denied.  Pursuant to my individual practices, Plaintiffs were given the opportunity to file an amended complaint after they received

Defendants' motion to dismiss. They chose not to take this opportunity, and I see no reason to vary the rule here.

### III. CONCLUSION

For the foregoing reasons, Plaintiffs' claims with regard to the offerings they did not purchase are dismissed for lack of standing. Plaintiffs' claims related to allegations of conflicts of interest between the RBS Defendants and the rating agencies, as well as claims related to allegations of outdated rating models and inadequate credit enhancements, are dismissed for failure to state a claim. Plaintiffs' claims related to the disregard of underwriting guidelines may proceed.

The Clerk of the Court is instructed close the relevant motions (Docket Nos. 38 and 42).

**SO ORDERED**
March 31, 2010
**New York, New York**

**Hon. Harold Baer, Jr.**
**U.S.D.J.**