**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NEW JERSEY CARPENTERS HEALTH FUND, NEW JERSEY CARPENTERS VACATION FUND and BOILERMAKER BLACKSMITH NATIONAL PENSION TRUST, *on Behalf of Themselves and All Others Similarly Situated*,<br><br>Plaintiffs,<br><br>*v.*<br><br>RESIDENTIAL CAPITAL, LLC, RESIDENTIAL FUNDING, LLC, RESIDENTIAL ACCREDITED LOANS, INC., BRUCE J. PARADIS, KENNETH M. DUNCAN, DAVEE L. OLSON, RALPH T. FLEES, LISA R. LUNDSTEN, JAMES G. JONES, DAVID M. BRICKER, JAMES N. YOUNG, RESIDENTIAL FUNDING SECURITIES CORPORATION d/b/a GMAC RFC SECURITIES, GOLDMAN, SACHS & CO., RBS SECURITIES, INC. f/k/a GREENWICH CAPITAL MARKETS, INC. d/b/a RBS GREENWICH CAPITAL, DEUTSCHE BANK SECURITIES, INC., CITIGROUP GLOBAL MARKETS, INC., CREDIT SUISSE SECURITIES (USA) LLC, BANK OF AMERICA CORPORATION *as successor-in-interest to* MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., UBS SECURITIES, LLC, JPMORGAN CHASE, INC. *as successor-in-interest to* BEAR, STEARNS & CO., INC. and MORGAN STANLEY & CO., INC.,<br><br>Defendants. | **Case No.: 08-CV-8781 (HB)**<br><br><br>**CONSOLIDATED THIRD AMENDED SECURITIES CLASS ACTION COMPLAINT**<br><br><br>**ECF CASE**<br><br><br>**FILED UNDER SEAL** |

## TABLE OF CONTENTS

I.     **SUMMARY OF THE ACTION** ...................................................................1

II.    **JURISDICTION AND VENUE** .............................................................8

III.   **PARTIES AND RELEVANT NON-PARTIES** ....................................8

IV.   **BACKGROUND** ....................................................................................24

     A.    Residential Capital Emerges As a Major Issuer
          and Underwriter of Mortgage-Backed Securities ..................................24

     B.    Residential Capital's Securitization and Underwriting Operations ......27

     C.    Residential Capital and the Underwriter Defendants' Ability to
          Market the Certificates at All, Much Less at a Profit, Depended
          on Ensuring That Substantially All of Them Were Assigned the
          Highest Rating From the Rating Agencies ............................................28

     D.    The Collapse of the Certificates' Ratings After Each
          Offering Reflects Defective Loan Collateral and Faulty Origination ...................29

     E.    Investigations and Disclosures Subsequent to
          Offerings Evidence That HFN Disregarded
          Stated Mortgage Loan Underwriting Guidelines ..................................31

     F.    The Offering Documents Failed to Disclose the Underwriter
          Defendants' Inadequate Due Diligence with Respect to
          Compliance with Stated Mortgage Loan Underwriting Guidelines ....35

     G.    Due Diligence Reports Commissioned and Reviewed by the
          Underwriters Prior to Each Offering Revealed That a Highly
          Material Portion of the Loans in Every Offering
          Failed to Comply with Underwriting Guidelines ..................................38

     H.    Governmental Agency Investigations Subsequent to Offerings
          Evidence Faulty Loan Origination and Securitization Practices ..........40

     I.    Subsequent Disclosures Evidence Underwriter Defendants'
          Write-Downs and Near Collapse Due to Their Role in
          Securitizing and Underwriting Mortgage-Backed Securities ..............42

          1.    Defendant Ally Securities ..........................................................42

          2.    Defendant GSC ...........................................................................44

i

3.    Defendant DBS ........................................................................48

4.    Defendant CITI .......................................................................49

5.    Defendant UBS .......................................................................51

**V.    MATERIAL MISSTATEMENTS AND
OMISSIONS IN THE OFFERING DOCUMENTS** ...................................................53

A.    Defendants' Material Misstatements and Omitted Information
Regarding Stated Mortgage Loan Underwriting Guidelines .................................53

1.    The Registration Statements ....................................................53

2.    The Prospectus Supplements ...................................................60

B.    The Offering Documents Omitted Information
Regarding Delinquencies as of the Cut-Off Dates ...............................................65

**VI.    CLASS ACTION ALLEGATIONS** ...............................................................67

**VII.    CAUSES OF ACTION** ................................................................................69

FIRST CAUSE OF ACTION .........................................................................69

SECOND CAUSE OF ACTION ....................................................................72

THIRD CAUSE OF ACTION ........................................................................73

**VIII.    PRAYER FOR RELIEF** ..............................................................................75

Court-Appointed Lead Plaintiff and Class Representative New Jersey Carpenters Health Fund ("Carpenters Health Fund" or "Lead Plaintiff"); Plaintiff and Class Representative New Jersey Carpenters Vacation Fund ("Carpenters Vacation Fund," with Carpenters Health Fund, the "Carpenters Funds"); Plaintiff Boilermaker Blacksmith National Pension Trust ("Boilermaker Pension Trust"); and Plaintiffs-in-Intervention Iowa Public Employees' Retirement System ("IPERS"); Midwest Operating Engineers Pension Trust Fund ("Midwest OE"); Orange County Employees Retirement System ("OCERS"); and Police and Fire Retirement System of the City of Detroit ("Detroit PFRS") (collectively, "Plaintiffs") hereby make their Third Amended Securities Class Action Complaint against the defendants named below.  In so doing, Plaintiffs do not waive and hereby preserve all previously asserted claims regarding all securities included in the Consolidated First Amended Securities Class Action Complaint ("First Amended Complaint" or "FAC") filed May 18, 2009 and the Consolidated Second Amended Securities Class Action Complaint ("Second Amended Complaint" or "SAC") filed January 3, 2011 in this action including any previously dismissed claims or parties, as if fully set forth herein.  Plaintiffs believe that substantial additional evidentiary support for the allegations set forth below will be developed after a reasonable opportunity for discovery.

## I.

## <u>SUMMARY OF THE ACTION</u>

1.      This Consolidated Third Amended Securities Class Action Complaint (the "Complaint" or "TAC") is alleged upon personal knowledge with respect to Plaintiffs, and upon information and belief with respect to all other matters.  This action is brought pursuant to Sections 11, 12 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2) and 77o, by Plaintiffs on their own behalf and as a class action on behalf of all persons and entities who purchased or otherwise acquired interests in the Issuing Trusts (as set forth in ¶¶ 29-30, *infra*) (the "Issuing Trusts") pursuant or traceable to two Registration Statements and

1

accompanying Prospectuses filed with the Securities and Exchange Commission ("SEC") by Residential Accredit Loans, Inc. ("RALI"), a subsidiary of Residential Capital, LLC f/k/a Residential Capital Corporation ("RCC"),[1] on March 3, 2006 (No. 333-131213) (the "2006 Registration Statement") and on April 3, 2007 (No. 333-140610) (the "2007 Registration Statement," and together with the 2006 Registration Statement, collectively referred to herein as the "Registration Statements") (the "Class").[2]

2.      Pursuant to the Registration Statements and Prospectus Supplements incorporated therein (collectively, the "Offering Documents"), $27 billion of RALI mortgage-backed securities ("MBS") designated Mortgage Pass-Through Certificates (the "Certificates") were sold to Plaintiffs and the Class in forty-one (41) Offerings as set forth below (¶¶ 29-30) (the "Offerings").  The value of the Certificates was dependent upon the repayment of the underlying mortgage loans since the principal and interest payments due to investors were secured and derived solely from cash flows from those loans being repaid and the interest thereon.[3]

3.      Plaintiffs seek redress against the individual signatories to the Registration Statements, Defendants Bruce J. Paradis ("Paradis"), Kenneth M. Duncan ("Duncan"), Davee L. Olson ("Olson"), Ralph T. Flees ("Flees"), Lisa R. Lundsten ("Lundsten"), James G. Jones ("Jones"), David M. Bricker ("Bricker") and James N. Young ("Young"); and certain Underwriters of the Offerings, Defendants Ally Securities LLC f/k/a Residential Funding

---

[1]      Defendant RCC is a wholly-owned subsidiary of General Motors Acceptance Corporation ("GMAC"). Although GMAC was a wholly-owned subsidiary of General Motors Corporation ("GM"), it is now a GM subsidiary that is majority-owned by a consortium of investors led by Cerebus Capital LLC (¶¶ 24, 97).  For the purposes of this Complaint, GMAC and GM are collectively referred to as "General Motors."

[2]      Plaintiffs recognize that, in its class certification decision, this Court certified a class for four Offerings limited temporally to ten trading days from each respective Offering date.   For pleading purposes Plaintiffs retain all their rights and retain the original class period asserted in the FAC.

[3]      As the borrowers on each of the underlying mortgage loans paid their mortgages, distributions were made to investors through the Issuing Trusts in accordance with the terms of the Offering Documents governing the issuance of the Certificates.  If borrowers failed to pay back their mortgages, defaulted, or were forced into foreclosure, the resulting losses flowed to the Certificate investors.  As set forth in the Prospectus Supplements, the Certificates were divided into a structure of classes, or "tranches," reflecting their contractual priorities of seniority, payment, exposure to risk and default, and interest payments.

Securities, LLC d/b/a GMAC RFC Securities  ("Ally Securities"); Goldman, Sachs & Co. ("GSC"); Deutsche Bank Securities Inc. ("DBS"); Citigroup Global Markets Inc. ("CITI"); and UBS Securities LLC ("UBS") (collectively, the "Underwriter Defendants").  RCC; RALI, the Depositor for each of the Offerings; Residential Funding Company, LLC ("RFC"), the Sponsor and Seller for each of the Offerings; and Ally Securities, along with their affiliates and subsidiaries are referred to collectively as "Residential Capital."

4.     All 41 Offerings at issue had a common originator: Homecomings Financial LLC f/k/a Homecomings Financial Network, Inc. ("HFN"), a wholly-owned subsidiary of RFC. Further, each Prospectus Supplement issued in connection with each Offering represented that whether or not the loans were originated by Homecomings itself or acquired by Homecomings or RFC after they were originated, "*all the mortgage loans* were originated in accordance with the underwriting criteria of [RFC]."  The RFC Guidelines were then summarized *identically* in each Prospectus Supplement.

5.     As set forth below, these statements misstated and omitted material facts in violation of Sections 11, 12 and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o, because in fact the underwriting guidelines were systematically disregarded in originating the mortgage loan collateral.  Defendants are strictly or negligently liable for the material misstatements and omissions under the Securities Act alleged herein.  The Complaint asserts no allegations or claims sounding in fraud.

6.     By the end of 2005, the entity that ultimately came to be known as Ally Financial, Inc. but at the time was known as GMAC LLC, and its subsidiary, Residential Capital, had become one of the largest issuers of MBS, not just in the United States, but in the world. According to *Inside Mortgage Finance* ("*IMF*"), in 2005 alone, Residential Capital issued over

3

$56.93 billion of MBS, making it the fifth largest issuer of such securities. Residential Capital was capable of securitizing such massive quantities of mortgage collateral because it created and operated what was essentially a high-speed assembly line for the securitization of mortgage loans. Residential Capital had sufficient "product" in the form of mortgage loans because it owned and operated HFN as its subsidiary. HFN solely acquired and originated non-conforming (sub-prime and Alt-A) loans. The HFN-originated loans were immediately purchased by RFC and securitized by RALI.[4] Residential Funding Securities, LLC, which later became known as Ally Securities, another affiliate of Residential Capital, underwrote 25 of the Offerings.

7.     The Certificates could not be sold at all – much less profitably – unless they had been assigned the highest investment grade rating from one or more Nationally Recognized Statistical Ratings Organizations ("NRSRO"), specifically, Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's Ratings Services, a Division of the McGraw-Hill Companies ("S&P," and together with Moody's the "Rating Agencies"). The reason was simple. Without such ratings, they could not be purchased by the Underwriter Defendants' principal potential clientele – institutional investors, namely pension funds and insurance companies.

8.     The Certificates were substantially assigned the highest investment grade ratings by the Rating Agencies. Moody's and S&P rated $26.1 billion and $26.2 billion, respectively, of the $27 billion Certificates issued pursuant to the Offerings complained of herein. (¶ 65). At the time the Certificates were issued, Moody's assigned its highest investment grade rating of "Aaa" to 95.22%, or $26.1 billion, of the Moody's-rated Certificates, and S&P assigned its highest investment grade rating of "AAA" to 95.22%, or $26.2 billion, of the S&P-rated Certificates.[5]

---

[4]     RALI served as "Depositor" for the Offerings (¶ 27) acquiring the loans from RFC and "depositing" them to the Issuing Trusts where RALI securitized the cash-flows from the mortgage loans and formed the Certificates.

[5]     "AAA" and "Aaa" are collectively referred to herein as "AAA."

(*Id.*).  These ratings purportedly reflected the risk or probability of default by the borrower according to the Offering Documents. (¶¶ 64-65).  None of the Certificates were initially rated below "investment grade" ("Ba1" and below for Moody's and "BB+" and below for S&P). (¶ 64).

9.      By the time the initial complaint was filed in this Action, the value of the Certificates had collapsed.  Further, the likelihood of these securities ever recovering their value is severely diminished by the fact that over 37% of the mortgage loans underlying the Certificates – the source of financial return for Certificate investors – as of the filing of the FAC, were in delinquency, default, foreclosure or repossession.  (¶¶ 161).  Moreover, approximately 100% of the Certificates had, by May 2009, been downgraded by Moody's to speculative and junk bond status.  (¶ 65).

10.     Since Certificate investors were dependent on the quality of the underlying mortgage loan collateral for receipt of a return on their investment, the descriptions of the loan origination guidelines in the Offering Documents and the originator's purported compliance with those guidelines were highly material disclosures to Certificate purchasers.  The descriptions of the underwriting guidelines included in the Offering Documents described the policies employed by RFC and its wholly-owned subsidiary HFN, in examining borrower creditworthiness and verifying borrower information. (¶¶ 133-161).  These portions of the Offering Documents also contained misstatements and omissions because, as has emerged only well after issuance of the Certificates, HFN, its correspondent lenders and other mortgage loan originators systematically disregarded the stated underwriting guidelines set forth in the Offering Documents.  *Id.*  These misstatements and omissions as well as the defective nature of the Certificate collateral were further reflected in the fact that the Rating Agencies themselves, in downgrading the Certificates

from the highest investment grade to junk status, specifically attributed the downgrades to "aggressive underwriting" in the origination of the mortgage loans (¶ 90) and the utter collapse of the AAA ratings originally assigned to the Certificates (¶ 65); and the uniform pattern of increases in delinquency, default and foreclosure rates after the consummation of the various Offerings (regardless of when the Offering occurred) (¶¶ 88-91).

11.     While compliance with those loan underwriting guidelines was highly material to Certificate investors, who were dependent on the creditworthiness of the borrowers for interest and principal payments, Residential Capital had no such similar financial interest.  Residential Capital and the Underwriting Defendants each conducted separate due diligence with respect to whether the loans were originated in conformity with the underwriting guidelines set forth in the Offering Documents.  Residential Capital's "due diligence" principally occurred not during the underwriting phase of the Offering by the Underwriter Defendants, but when Residential Capital acquired the collateral from its subsidiary HFN.  (¶¶ 59-60).  At that stage, there was a disincentive for Residential Capital to reject loans as non-compliant with stated guidelines because the loans were the property of RCC regardless, since the loans were originated by its subsidiary.

12.     Perhaps worse, the Underwriter Defendants' "due diligence" was extremely limited and defectively conducted in violation of the Underwriter Defendants' own internal guidelines as the Underwriter Defendants were forced to review loans on an expedited basis and therefore did not commit to a full review of the mortgage loans underlying the securitizations. (*see* ¶¶ 73-80). ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

6

████████████████████████████████████████

██████████████████████████████

13.     To assess the overall compliance with the guidelines, prior to each Offering Defendants examined the loan files of a small sample of loans, purportedly as a proxy for determining whether the pool of loans as a whole was compliant with guidelines.  Rather than result in a *de minimis* percentage of non-compliant loans however, the reunderwriting of even the small samples of loans repeatedly resulted in dramatic findings that as much as 50% of the sampled loans were non-compliant with guidelines.  Such findings should have led to either an examination of the entire loan pool for compliance with underwriting guidelines, or rejection of that pool of loans for material non-compliance with the underwriting guidelines.  Instead, a small number of the defective loans sampled would typically get "kicked" from the deal and the offering would go forward with the remaining unsampled collateral comprising the mortgage loan pool.

14.     As a result of these material misstatements and omissions of material fact Plaintiffs and the Class have suffered damages for which Defendants are liable pursuant to Sections 11, 12 and 15 of the Securities Act.

## II.

## JURISDICTION AND VENUE

15.     The claims alleged herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.  Jurisdiction is conferred by Section 22 of the Securities Act and venue is proper pursuant to Section 22 of the Securities Act.

16.     The violations of law complained of herein occurred in this County, including the dissemination of materially false and misleading statements complained of herein into this

7

County.  The Underwriter Defendants their affiliates, subsidiaries and/or successors-in-interest conduct or conducted business in this County.

III.

<strong><u>PARTIES AND RELEVANT NON-PARTIES</u></strong>

17.     Court-Appointed Lead Plaintiff and Class Representative Carpenters Health Fund and Plaintiff and Class Representative Carpenters Vacation Fund are Taft-Hartley Pension Funds.  As reflected in the Certification of Securities Class Action filed herein, the Carpenters Funds purchased the following classes of Certificates pursuant and traceable to the Registration Statements and Prospectus Supplements and have been damaged thereby:

| Certificates Purchased | Date of Purchase | Amount of Units Purchased | Price Paid (Per Unit) |
|---|---|---|---|
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO7, Class M1 | 10/5/2006 | 180,000 | $1.01 |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS1, Class 1A1 | 1/1/2007 | 415,000 | $1.01 |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS1, Class 2A10 | 1/1/2007 | 155,000 | $1.01 |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QH4, Class A1 | 4/23/2007 | 80,000 | $1.00 |

18.     Plaintiff Boilermaker Pension Trust is a Taft-Hartley Pension Fund.  As reflected in the Certification of Securities Class Action filed herein, the Boilermaker Pension Trust purchased the following Certificates pursuant and traceable to the Registration Statements and Prospectus Supplements and has been damaged thereby:

8

| Certificates Purchased | Date of Purchase | Amount of Units Purchased | Price Paid (Per Unit) |
|---|---|---|---|
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QO4, Class A1A | 12/7/2007 | 961,530.55 | $0.96 |

19.     Plaintiff IPERS is a public pension fund.  As reflected in the Certification of Securities Class Action filed with IPERS' Motion to Intervene on July 30, 2010 (*see* Dkt. Nos. 98-100), IPERS purchased the following Certificates pursuant and traceable to the Registration Statements and Prospectus Supplements:

| Certificates Purchased | Date of Purchase | Amount of Units Purchased | Price Paid (Per Unit) |
|---|---|---|---|
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO10, Class A1 | 5/1/2007 | 7,073,554.39 | $0.9986 |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS1, Class 2A2 | 5/29/2008 | 13,460,044.45 | $0.7275 |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QO2, Class A1 | 3/27/2008 | 3,356,988.00 | $0.7375 |

20.     Plaintiff OCERS is public pension fund.  As reflected in the Certification of Securities Class Action filed with OCERS' Motion to Intervene on July 30, 2010 (*see* Dkt. Nos. 98-100), OCERS purchased the following Certificates pursuant and traceable to the Registration Statements and Prospectus Supplements:

| Certificates Purchased | Date of Purchase | Amount of Units Purchased | Price Paid (Per Unit) |
|---|---|---|---|
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS18, Class 3A1 | 6/11/2007 | 1,376,865.76 | $0.9859 |

9

21.     Plaintiff Midwest OE is a Taft-Hartley Pension Fund.  As reflected in the Certification of Securities Class Action filed with Midwest OE's Motion to Intervene on July 13, 2010 (*see* Dkt. Nos. 91-93, 95), Midwest OE purchased the following Certificates pursuant and traceable to the Registration Statements and Prospectus Supplements:

| Certificates Purchased | Date of Purchase | Amount of Units Purchased | Price Paid (Per Unit) |
|---|---|---|---|
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO9, Class 1A1B | 9/26/2007 | 2,293,260.45 | $0.9874 |

22.     Detroit PFRS is a pension plan and trust established by the Charter and Municipal Code of the City of Detroit, Michigan.  Detroit PFRS has approximately $3.5 billion of net assets held in trust for the benefit of the active and retired police officers and firefighters of the City of Detroit, Michigan. As reflected in the certification filed with Detroit PFRS' Motion to Intervene on July 2, 2010 (*see* Dkt. Nos. 84-86), Detroit PFRS purchased the following Certificates pursuant and traceable to the Registration Statements and Prospectus Supplements and has been damaged by the following amounts:

| Certificates Purchased | Date of Purchase | Amount of Units Purchased | Price Paid (Per Unit) |
|---|---|---|---|
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS8, Class A1 | 3/20/2008 | 1,451,140.68 | $0.84 |

23.     Non-Defendant General Motors Corporation ("GM") is primarily engaged in automotive production and marketing, and financing and insurance operations.  GM is a Delaware corporation with its principal offices located at 300 Renaissance Center, Detroit, Michigan.

10

24.     Non-Defendant Ally Financial, Inc., f/k/a GMAC, Inc., f/k/a GMAC, LLC, f/k/a General Motors Acceptance Corporation (collectively referred to herein as "Ally Financial" or "GMAC"), is principally located at 200 Renaissance Center, Detroit, Michigan 48265.  GMAC was founded in 1919 as a wholly-owned subsidiary of General Motors Corporation, and was originally established to provide GM dealers with the automotive financing necessary to acquire and maintain vehicle inventories and to provide retail customers the means by which to finance vehicle purchases through GM dealers.  On November 30, 2006, GM sold a 51% interest in GMAC for approximately $7.4 billion to FIM Holdings LLC, an investment consortium led by Cerberus FIM Investors, LLC, the sole managing member, and changed its name to GMAC, LLC.  GMAC was a leading, independent, globally diversified, financial services firm with approximately $248 billion of assets as of December 31, 2007 and operations in approximately 40 countries.  Since its inception, GMAC greatly expanded its business to include the following primary lines of business – Global Automotive Finance, Mortgage (Residential Capital, LLC) and Insurance.  Largely due to the conduct described herein, GMAC did not survive the financial crisis.  It eventually received a substantial government bailout and changed its name to Ally Financial.  Ally Financial is now approximately 74% owned by the U.S. Government.

25.     Non-Defendant Residential Capital, LLC, f/k/a Residential Capital Corporation (collectively referred to herein as "RCC") is a wholly-owned subsidiary of GMAC Mortgage Group, LLC, which in turn is a subsidiary of Ally Financial Inc., and is principally located at 8400 Normandale Lake Boulevard, Suite 600, Minneapolis, Minnesota 55437, has principal offices of operations in Minneapolis, Minnesota and Fort Washington, Pennsylvania and maintains significant presence in states throughout the U.S., including New Jersey, Texas and California.  RCC is the parent company of Defendants RALI, RFC and the principal originator of

11

the loan collateral, HFN.  At all relevant times, RCC and its subsidiaries originated, purchased, sold, and securitized residential mortgage loans primarily in the United States, as well as internationally;  provided primary and master servicing to investors in residential mortgage loans and securitizations; provided collateralized lines of credit, which are referred to as warehouse lending facilities, to other originators of residential mortgage loans; and held a portfolio of residential mortgage loans for investment or sale together with interests retained from its securitization activities.  RCC is liable under the Securities Act, but is not named as a Defendant herein because on May 14, 2012, it petitioned for bankruptcy protection pursuant to Chapter 11 of the U.S. Bankruptcy Code.

26.     Non-Defendant Residential Funding Company, LLC, f/k/a Residential Funding Corporation (collectively referred to herein as "RFC"), acted as the Sponsor for the Certificates issued pursuant to the Registration Statements.  Residential Funding Corporation changed its status from a Delaware Corporation to a limited liability company in October 2006.  Residential Capital originated or acquired all underlying mortgage collateral for the various Offerings via the Sponsor, RFC.  (¶¶ 59-60).  RFC made certain representations and warranties in connection with the loan pools collateralizing the Certificates.  (¶ 157)  As set forth in the Registration Statements, RFC then conveyed the mortgages to the Depositor, RALI, which was formed for the sole purpose of creating, and thereafter depositing the collateral into, the Issuing Trusts.  The Issuing Trusts then issued the Certificates supported by the cash flows from the assets and were secured by those assets.  RFC's principal office is located at 8400 Normandale Lake Boulevard, Suite 600, Minneapolis, Minnesota 55437.  RFC is liable under the Securities Act, but is not named as a Defendant herein because on May 14, 2012, it petitioned for bankruptcy protection pursuant to Chapter 11 of the U.S. Bankruptcy Code.

12

27.     Non-Defendant RALI served as the Depositor for the Offerings and is principally located at 8400 Normandale Lake Boulevard, Suite 600, Minneapolis, Minnesota 55437.  RALI is the wholly-owned subsidiary of RCC.  RALI filed Registration Statements and accompanying Prospectuses with the SEC in connection with the Offerings.  The role of RALI as the Depositor was to purchase the mortgage loans from the seller and then assign the mortgage loans and all of its rights and interest under the mortgage loan purchase agreement to the trustee for the benefit of the Bondholders.  RALI, as Depositor, was also responsible for preparing and filing any reports required under the Securities Exchange Act of 1934.  RALI is liable under the Securities Act, but is not named as a Defendant herein because on May 14, 2012, it petitioned for bankruptcy protection pursuant to Chapter 11 of the U.S. Bankruptcy Code.

28.     RALI filed the following Registration Statements and accompanying Prospectuses with the SEC on Form S-3, as subsequently amended on Form S-3/A, under Registration Nos. 333-131213 and 333-140610 as follows:

**The 2006 Registration Statement:**

| Date Filed | Form Type | Amount Registered |
|---|---|---|
| January 23, 2006 | S-3 | $ 1,000,000 |
| March 3, 2006 | S-3/A | $ 34,723,478,970[6] |

**The 2007 Registration Statement:**

| Date Filed | Form Type | Amount Registered |
|---|---|---|
| February 12, 2007 | S-3 | $ 1,000,000 |
| April 3, 2007 | S-3/A | $ 80,000,000,000[7] |

---

[6]     The amount registered under the 2006 Registration Statement includes $24,723,478,970 previously registered under Registration No. 333-126732 on July 30, 2005 and which remained unissued as of March 3, 2006.

[7]     The amount registered under the 2007 Registration Statement includes $27,349,759,494 previously registered under Registration No. 333-131213 (the 2006 Registration Statement) and which remained unissued as of April 3, 2007.

29.    RFC and RALI, as Sponsor/Seller and Depositor, respectively, formed the following twenty-nine (29) Issuing Trusts, by which RFC and RALI issued, or caused to be issued, the Certificates, pursuant to the 2006 Registration Statement:

| Issuing Trust | Approximate Principal Amount | Approx. Offering Date | Underwriter(s) | Depositor/Issuer | Sponsor |
|---|---|---|---|---|---|
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO7 | $1,542,440,000 | September 29, 2006 | UBS Securities LLC | Residential Accredit Loans, Inc. | Residential Funding Corporation |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS1 | $1,280,501,451 | January 26, 2007 | Citigroup Global Markets | Residential Accredit Loans, Inc. | Residential Funding Co. LLC |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QA10 | $375,502,000 | November 22, 2006 | GMAC RFC Securities | Residential Accredit Loans, Inc. | Residential Funding Co. LLC |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QA11 | $372,431,000 | December 21, 2006 | GMAC RFC Securities | Residential Accredit Loans, Inc. | Residential Funding Co. LLC |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QA4 | $304,442,000 | May 26, 2006 | GMAC RFC Securities | Residential Accredit Loans, Inc. | Residential Funding Corp. |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QA6 | $622,965,000 | July 27, 2006 | GMAC RFC Securities | Residential Accredit Loans, Inc. | Residential Funding Corp. |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QA7 | $588,151,000 | August 28, 2006 | GMAC RFC Securities | Residential Accredit Loans, Inc. | Residential Funding Corp. |

14

| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QA8 | $795,053,000 | September 26, 2006 | GMAC RFC Securities | Residential Accredit Loans, Inc. | Residential Funding Corp. |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO10 | $889,857,000 | December 27, 2006 | Goldman Sachs & Co | Residential Accredit Loans, Inc. | Residential Funding Co. LLC |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO3 | $644,812,000 | March 28, 2006 | Goldman Sachs & Co | Residential Accredit Loans, Inc. | Residential Funding Corp. |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO5 | $1,071,587,000 | May 26, 2006 | UBS Securities LLC | Residential Accredit Loans, Inc. | Residential Funding Corp. |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO6 | $1,290,297,000 | June 28, 2006 | Goldman Sachs & Co | Residential Accredit Loans, Inc. | Residential Funding Corp. |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO8 | $1,288,119,000 | October 30, 2006 | Lehman Brothers | Residential Accredit Loans, Inc. | Residential Funding Co. LLC |
| RA RALI Mortgage Asset-Backed Pass-Through Certificates, Series LI 2006-QO9 | $890,657,000 | November 28, 2006 | Lehman Brothers | Residential Accredit Loans, Inc. | Residential Funding Co. LLC |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS11 | $742,487,542 | August 28, 2006 | Deutsche Bank Securities; Morgan Stanley | Residential Accredit Loans, Inc. | Residential Funding Corp. |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS15 | $531,038,675 | October 27, 2006 | UBS Securities LLC; Goldman Sachs & Co. | Residential Accredit Loans, Inc. | Residential Funding Co. LLC |

15

| | | | | | |
|---|---|---|---|---|---|
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS18 | $1,164,635,393 | December 27, 2006 | GMAC RFC Securities; Lehman Brothers; Deutsche Bank Securities | Residential Accredit Loans, Inc. | Residential Funding Co. LLC |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS7 | $530,520,315 | June 26, 2006 | Citigroup Global Markets; Countrywide Securities Corp. | Residential Accredit Loans, Inc. | Residential Funding Corp. |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS8 | $953,783,554 | July 25, 2006 | GMAC RFC Securities; Citigroup Global Markets | Residential Accredit Loans, Inc. | Residential Funding Corp. |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS9 | $533,095,899 | July 24, 2006 | GMAC RFC Securities; Deutsche Bank Securities | Residential Accredit Loans, Inc. | Residential Funding Corp. |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QA1 | $410,069,000 | January 25, 2007 | GMAC RFC Securities | Residential Accredit Loans, Inc. | Residential Funding Co. LLC |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QA2 | $366,984,000 | February 23, 2007 | GMAC RFC Securities | Residential Accredit Loans, Inc. | Residential Funding Co. LLC |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QH2 | $348,425,000 | February 23, 2007 | GMAC RFC Securities; Goldman Sachs & Co. | Residential Accredit Loans, Inc. | Residential Funding Co. LLC |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QH3 | $349,476,000 | March 28, 2007 | Goldman Sachs & Co | Residential Accredit Loans, Inc. | Residential Funding Co. LLC |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QO2 | $527,132,000 | February 26, 2007 | Deutsche Bank Securities | Residential Accredit Loans, Inc. | Residential Funding Co. LLC |

1727624.1

| | | | | | |
|---|---|---|---|---|---|
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QO3 | $296,295,000 | March 28, 2007 | GMAC RFC Securities | Residential Accredit Loans, Inc. | Residential Funding Co. LLC |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS2 | $529,765,806 | January 26, 2007 | Goldman Sachs & Co; Morgan Stanley | Residential Accredit Loans, Inc. | Residential Funding Co. LLC |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS4 | $736,484,029 | March 28, 2007 | Deutsche Bank Securities; RBS Securities | Residential Accredit Loans, Inc. | Residential Funding Co. LLC |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS5 | $426,647,013 | March 28, 2007 | Citigroup Global Markets | Residential Accredit Loans, Inc. | Residential Funding Co. LLC |

30.     RFC and RALI, as Sponsor/Seller and Depositor, respectively, formed the following twelve (12) Issuing Trusts, by which RFC and RALI issued, or caused to be issued, the Certificates, pursuant to the 2007 Registration Statement:

| Certificate Trust Series | Approximate Principal Amount | Approx. Offering Date | Underwriter(s) | Depositor/Issuer | Sponsor |
|---|---|---|---|---|---|
| RALI Mortgage Asset-Backed Pass-Through Certificates, 2007-QH4 | $ 397,963,000 | April 26, 2007 | Goldman, Sachs & Co./ Residential Funding Securities, LLC | Residential Accredit Loans, Inc. | Residential Funding Company, LLC |
| RALI Mortgage Asset-Backed Pass-Through Certificates, 2007-QO4 | $ 502,837,000 | May 30, 2007 | Residential Funding Securities, LLC | Residential Accredit Loans, Inc. | Residential Funding Company, LLC |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QA3 | $882,356,800 | April 26, 2007 | GMAC RFC Securities | Residential Accredit Loans, Inc. | Residential Funding Co. LLC |

17

| | | | | | |
|---|---|---|---|---|---|
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QA5 | $491,200,000 | October 9, 2007 | GMAC RFC Securities | Residential Accredit Loans, Inc. | Residential Funding Co. LLC |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QH5 | $497,503,000 | May 29, 2007 | GMAC RFC Securities; Goldman Sachs & Co. | Residential Accredit Loans, Inc. | Residential Funding Co. LLC |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QH6 | $595,208,000 | June 27, 2007 | GMAC RFC Securities; Goldman Sachs & Co. | Residential Accredit Loans, Inc. | Residential Funding Co. LLC |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QH8 | $540,449,900 | September 18, 2007 | GMAC RFC Securities | Residential Accredit Loans, Inc. | Residential Funding Co. LLC |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QH9 | $573,585,400 | October 4, 2007 | GMAC RFC Securities | Residential Accredit Loans, Inc. | Residential Funding Co. LLC |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QO5 | $231,187,000 | August 29, 2007 | GMAC RFC Securities | Residential Accredit Loans, Inc. | Residential Funding Co. LLC |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS11 | $300,636,797 | September 26, 2007 | GMAC RFC Securities | Residential Accredit Loans, Inc. | Residential Funding Co. LLC |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS6 | $796,984,867 | April 25, 2007 | GMAC RFC Securities; Barclays Capital | Residential Accredit Loans, Inc. | Residential Funding Co. LLC |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS7 | $792,849,258 | May 29, 2007 | GMAC RFC Securities; Deutsche Bank Securities | Residential Accredit Loans, Inc. | Residential Funding Co. LLC |

31.     Each of the Issuing Trusts for the various Offerings set forth above was a common law trust formed for the sole purpose of holding and issuing the Certificates.  Each of

18

the Issuing Trusts issued hundreds of millions of dollars' worth of Certificates pursuant to a Prospectus Supplement, incorporated by reference into the corresponding Registration Statement, which broke out and identified numerous classes of Certificates within each Offering.

32.     Defendant Bruce J. Paradis ("Paradis") was, during the relevant time period, RALI's President and Chief Executive Officer.  Paradis also served as the President of Defendant RFSC.  Paradis signed the 2006 Registration Statement for the Offerings.

33.     Defendant Kenneth M. Duncan ("Duncan") was RALI's Acting Chief Financial Officer (Principal Financial Officer).  Duncan signed the 2006 Registration Statement for the Offerings.

34.     Defendant Davee L. Olson ("Olson") was a Director of RALI.  Olson signed the 2006 Registration Statement for the Offerings.

35.     Defendant Ralph T. Flees ("Flees") was, at all relevant times, RALI's Controller (Principal Accounting Officer).  Defendant Flees signed the 2006 and 2007 Registration Statements for the Offerings.

36.     Defendant Lisa R. Lundsten ("Lundsten") signed the 2006 and 2007 Registration Statements for the Offerings as Attorney-in-Fact.

37.     Defendant James G. Jones ("Jones") was RALI's President and Chief Financial Officer at the time the 2007 Registration Statement was issued and thereafter.  Jones signed the 2007 Registration Statement for the Offerings.

38.     Defendant David M. Bricker ("Bricker") was a Director of RALI as well as its Chief Financial Officer at the time the 2007 Registration Statement was issued and thereafter. Bricker signed the 2007 Registration Statement for the Offerings.

19

39.     Defendant James N. Young ("Young") was a Director of RALI at the time the 2007 Registration Statement was issued and thereafter.   Young signed the 2007 Registration Statement for the Offerings.

40.     The Defendants identified in ¶¶ 32-39 are referred to herein as the "Individual Defendants."  The Individual Defendants functioned as directors to the Issuing Trusts as they were officers and/or directors of RALI and signed either one or both of the Registration Statements for the registration of the securities which were thereafter issued by the Issuing Trusts.

41.     The Individual Defendants participated with the remaining Defendants in the wrongful acts and course of conduct or otherwise caused the damages and injuries claimed herein and are responsible in some manner for the acts, occurrences and events alleged in this Complaint.

42.     Defendant Ally Securities served as the underwriter for twenty-five (25) of the Offerings as set forth above in ¶¶ 29-30 (collectively the "Ally Offerings").  Ally Securities is an SEC registered broker-dealer, principally located at 8400 Normandale Lake Boulevard, Suite 600, Minneapolis, Minnesota 55437 and was formerly a wholly-owned subsidiary of RCC.  Ally Securities' banking operations are limited to broker-dealer functions in the issuance and underwriting of residential and commercial mortgage-backed securities.   Moreover, Ally Securities only conducts business with institutional clientele. Ally Securities was one of the leading MBS underwriters in the United States.   Ally Securities, as an essential part of its investment banking business, has substantial contacts within this County and during the relevant time period transacted and continues to transact business in New York – specifically New York County (*i.e.*, Wall Street and the financial markets) including through the Offerings.   Ally

20

Securities actively served as the underwriter in the sale of the Certificates and assisted in drafting and disseminating the Offering Documents pursuant to which the Certificates were issued.

43.     Defendant GSC served as the underwriter for ten (10) of the Offerings as set forth above in ¶¶ 29-30 (collectively the "GSC Offerings").  GSC is an SEC registered broker-dealer, principally located at 85 Broad Street, New York, New York 10004.   GSC is one of the leading MBS underwriters in the United States.  GSC, as an essential part of its investment banking business, maintains its principal place of business operations and has substantial contacts within this County and during the relevant time period transacted and continues to transact business in New York – specifically New York County (*i.e.*, Wall Street and the financial markets) including through the Offerings.  GSC actively served as the underwriter in the sale of the Certificates and assisted in drafting and disseminating the Offering Documents pursuant to which the Certificates were issued.

44.     Defendant DBS served as the underwriter for six (6) of the Offerings as set forth above in ¶¶ 29-30 (collectively the "DBS Offerings").  DBS is an SEC registered broker-dealer, principally located at 60 Wall Street, New York, New York 10005.  DBS is one of the leading MBS underwriters in the United States.  DBS, as an essential part of its investment banking business, in addition to maintaining its principal offices, has substantial contacts within this County and during the relevant time period transacted and continues to transact business in New York – specifically New York County (*i.e.*, Wall Street and the financial markets) including through the Offerings.  DBS actively served as the underwriter in the sale of the Certificates and assisted in drafting and disseminating the Offering Documents pursuant to which the Certificates were issued.

21

45.     Defendant CITI served as the underwriter for four (4) of the Offerings, as set forth above in ¶¶ 29-30 (collectively the "CITI Offerings").  CITI is an SEC-registered broker-dealer, principally located at 399 Park Avenue, 7th Floor, New York, New York 10043.  Defendant CITI was intimately involved in the CITI Offerings.  CITI is one of the leading MBS underwriters in the United States.  CITI, as an essential part of its investment banking business, has substantial contacts, including its principal offices, within this County and regularly transacts business in New York – specifically New York County (*i.e.*, Wall Street and the financial markets) including through the Offerings.  CITI actively served as the underwriter in the sale of the Certificates and assisted in drafting and disseminating the Offering Documents pursuant to which the Certificates were issued.

46.     Defendant UBS served as the underwriter for three (3) of the Offerings, as set forth above in ¶¶ 29-30 (the "UBS Offerings").   UBS is an SEC registered broker-dealer, principally located at 1285 Avenue of the Americas, 19th Floor, New York, New York 10019.  UBS is one of the leading MBS underwriters in the United States.  UBS, as an essential part of its investment banking business, maintains its principal offices and has substantial contacts within this County and during the relevant time period transacted business in New York – specifically New York County (*i.e.*, Wall Street and the financial markets) including through the Offerings.  UBS actively served as the underwriter in the sale of the Certificates and assisted in drafting and disseminating the Offering Documents pursuant to which the Certificates were issued.

47.     Non-Defendant Lehman Brothers Inc. ("LB"), the former investment banking arm of the now-defunct entity Lehman Brothers Holding, Inc. ("LBHI"), served as the underwriter for three (3) of the Offerings, as set forth above in ¶¶ 29-30 (collectively the "LB Offerings").

22

LB was an SEC registered broker-dealer, and was principally located at 745 Seventh Avenue, New York, New York 10019. LB was one of the leading MBS underwriters in the United States. LB, as underwriter for the LB Offering, is liable under Sections 11 and 12 of the Securities Act, but is not named as a Defendant herein because on September 15, 2008, its parent company, LBHI, filed for bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code, and in conjunction therewith, the Securities Investor Protection Corporation commenced proceedings to liquidate LB.

48.     Defendants Ally Securities, GSC, DBS, CITI and UBS are collectively referred to herein and the "Underwriters" or "Underwriter Defendants."

49.     Non-Defendant McGraw-Hill is a New York corporation with its principal place of business located at 1221 Avenue of the Americas, New York, New York 10020. Non-Defendant S&P, a division of McGraw-Hill, provides credit ratings, risk evaluation, investment research and data to investors. S&P participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiffs and other Class members. S&P provided pre-determined credit ratings for the Certificates, as set forth in the Prospectus Supplements.

50.     Non-Defendant Moody's, a division of Moody's Corp., is principally located at 250 Greenwich Street, New York, New York 10007, and provides credit ratings, risk evaluation, investment research and data to investors. Moody's provided pre-determined credit ratings for the Certificates, as set forth in the Prospectus Supplements.

51.     McGraw-Hill, inclusive of S&P, and Moody's are collectively referred to hereinafter as the "Rating Agencies").

**IV.**

**BACKGROUND**

A.   **Residential Capital Emerges As a Major Issuer**
     **and Underwriter of Mortgage-Backed Securities**

52.    As illustrated below, a mortgage securitization is where mortgage loans are acquired, pooled together, and then sold to investors, who acquire rights in the income flowing from the mortgage pools.



53.    When mortgage borrowers make interest and principal payments as required by the underlying mortgages, the cash flow is distributed to the holders of the MBS certificates in order of priority based on the specific tranche held by the MBS investors.  The highest tranche (also referred to as the senior tranche) is first to receive its share of the mortgage proceeds and is also the last to absorb any losses should mortgage-borrowers become delinquent or default on their mortgage.  Of course, because the investment quality and risk of the higher tranches is affected by the cushion afforded by the lower tranches, diminished cash flow to the lower tranches results in impaired value of the higher tranches.

54.     The securitization of loans fundamentally shifts the risk of loss from the mortgage loan originator to the investor who purchased an interest in the securitized pool of loans.  When the originator holds the mortgage through the term of the loan, it profits from the borrower's payment of interest and repayment of principal, but it also bears the risk of loss if the borrower defaults and the property value is not sufficient to repay the loan.  As a result, traditionally, the originator was economically vested in establishing the creditworthiness of the borrower and the true value of the underlying property through appraisal before issuing the mortgage loans.  In securitizations where the originator immediately sells the loan to an investment bank, it does not have the same economic interest in establishing borrower creditworthiness or a fair appraisal value of the property in the loan origination process.

55.     In the 1980s and 1990s, securitizations were generally within the domain of Government Sponsored Enterprises ("GSE"), *i.e.,* the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), which would purchase loans from originators.  Investors in these early GSE securitizations were provided protections since the underlying loans were originated pursuant to strict underwriting guidelines.

56.     Between 2001 and 2006, however, there was dramatic growth in both non-GSE loan originations and securitizations, for which there were no such underwriting limitations. That growth resulted in a commensurate increase in subprime securitizations.  According to *IMF* (2007), in 2001, agency originations were $1.433 trillion and securitizations were $1.087 trillion – far outpacing non-agency originations of $680 billion and securitizations of $240 billion.  In 2006, agency originations grew to $1.040 trillion while securitizations declined to $904 million. However, in that same period, non-agency originations had grown by 100% to $1.480 trillion,

and non-agency securitizations had grown by 330% to $1.033 trillion in 2006. Further, non-agency origination of subprime loans grew by 315% – from $190 billion in 2001 to $600 billion in 2006; and non-agency Alt-A origination grew by 566% – from $60 billion in 2001 to $400 billion in 2006. Non-agency securitizations of subprime loans had also grown exponentially by 415% – from $87.1 billion in 2001 to $448 billion in 2006. Along with the growth of subprime securitizations the growth of subprime home equity securitizations also grew by 216% – from approximately $150 billion in 2002 to $475 billion in 2006.

57. Residential Capital became a significant issuer in the MBS securitizations market. According to *IMF*, Residential Capital issued $42.336 billion and $56.93 billion of non-agency MBS in 2004 and 2005. (Moody's, *Bloomberg Asset Securitization*, January 2008.) In 2005, RFC was the fifth largest non-agency MBS issuer and ninth largest overall mortgage securities issuer. In 2006, Residential Capital increased their production to $66.2 billion, making it the fourth largest non-agency MBS issuer and eighth largest in total MBS issuance. In 2007, Residential Capital issued $6.6 billion of subprime MBS and an additional $22.2 billion of Alt-A MBS.

**B.     Residential Capital's Securitization Operations**

58. In 2005 through 2007, Residential Capital's RMBS operations were run primarily out of its offices at 8400 Normandale Lake Boulevard, Suite 600, Minneapolis, Minnesota 55437.

59. Residential Capital derived its profit from the sale of the Certificates for a price in excess of the amount paid for the underlying mortgage loans. The goal for Residential Capital was to sell the Certificates for a price above par or $1.00 per unit. As noted, for securitized Certificates to be marketable to begin with, approximately 80% of the securitization had to have

26

the highest rating by the rating agencies.  With that condition met, subprime securitizations and home equity securitizations posed the greater profit potential for Residential Capital.

60.    Before securitization could begin, Residential Capital had to acquire the underlying mortgage loans directly from its loan origination affiliate, HFN.  With the securitization structure in place, the Certificates were then issued through RALI Trusts designated with specific "Shelf" names.  The different shelf names reflected the different types of mortgage collateral underlying each of the specific RALI Offerings.  The underlying mortgages in the RALI "QA" Shelf Trusts were principally one- to four-family residential, hybrid adjustable-rate first lien mortgage loans; the underlying mortgages in the RALI "QH" Shelf Trusts were principally one- to four-family  residential,  payment-option, hybrid adjustable-rate first lien mortgage loans with a negative amortization feature; the underlying mortgages in the RALI "QO" Shelf Trusts were also principally one- to four-family residential, payment-option, adjustable-rate first lien mortgage loans with a negative amortization feature; and the underlying mortgages in the RALI "QS" Shelf Trusts were principally one- to four-family residential first lien mortgage loans.  RALI completed ten (10) QA Offerings, seven (7) QH Offerings, eleven (11) QO Offerings and seventeen (13) QS Offerings pursuant to the 2006 and 2007 Registration Statements, between March 28, 2006 and October 9, 2007, which are all the subject of this Complaint.

**C.      Residential Capital and the Underwriter Defendants' Ability to Market the Certificates at All, Much Less at a Profit, Depended on Ensuring That Substantially All of Them Were Assigned the Highest Rating From the Rating Agencies**

27

61.     Following each Offering, monthly reporting of default rates was provided by the Trustee for the Offering.  While these monthly reports contained reporting on defaults or delinquencies it provided investors with no explanation as to the causes.

62.      The causes of the default rates were further obscured by the dissemination of prices and valuations of the bonds well after each Offering that suggested that there was no material impairment of the bonds or their underlying mortgage loan collateral.

63.     The increase in delinquencies rates after issuance may be reflective of substantial instances of "early payment default" ("EPD") by borrowers on the underlying mortgage loans. Such defaults are highly indicative of failed and deficient loan underwriting and origination practices.  As reported by the Federal Bureau of Investigation (the "FBI") in its 2006 and 2007 Mortgage Fraud Reports, a study of three million residential mortgage loans found that between 30% and 70% of early payment defaults were linked to significant misrepresentations in the original loan applications.  The study cited by the FBI and conducted by Base Point Analytics found that loans that contained egregious misrepresentations were five times more likely to default in the first six months than loans that did not.  The misrepresentations included income inflated by as much as 500%, appraisals that overvalued the property by 50% or more, fictitious employers and falsified tax returns.  The 2006 FBI report also cited studies by a leading provider of mortgage insurance, Radian Guaranty Inc., that found the same top states for mortgage fraud – including the states where the underlying HFN mortgage collateral was principally originated – were also the same top states with the highest percentage of early payment defaults.

**D.      The Collapse of the Certificates' Ratings After
         Each Offering Reflects Defective Collateral and
         Faulty Origination**

28

64.     The Rating Agencies rated the Certificates pursuant to the following twenty-three

(23) level rating system:

| Color code | Number | Definition | Moodys | S & P | Fitch |
|---|---|---|---|---|---|
| | | **Investment Grade** | | | |
| | 10.0 | US Treasuries | *** | *** | *** |
| | 9.5 | Prime, maximum safety | Aaa | AAA | AAA |
| | 9.0 | Very high grade/quality | Aa1 | AA+ | AA+ |
| | 8.5 | " | Aa2 | AA | AA |
| | 8.0 | " | Aa3 | AA- | AA- |
| | 7.5 | Upper medium quality | A1 | A+ | A+ |
| | 7.0 | " | A2 | A | A |
| | 6.5 | " | A3 | A- | A- |
| | 6.0 | Lower medium grade | Baa1 | BBB+ | BBB+ |
| | 5.5 | " | Baa2 | BBB | BBB |
| | 5.0 | " | Baa3 | BBB- | BBB- |
| Color code | Number | Definition | Moodys | S & P | Fitch |
| | | **Speculative grade** | | | |
| | 4.5 | Speculative | Ba1 | BB+ | BB+ |
| | 4.0 | " | Ba2 | BB | BB |
| | 3.5 | " | Ba3 | BB- | BB- |
| | 3.0 | Highly speculative | B1 | B+ | B+ |
| | 2.5 | " | B2 | B | B |
| | 2.0 | " | B3 | B- | B- |
| | 1.5 | Substantial risk | Caa1 | CCC+ | CCC+ |
| | 1.0 | In poor standing | Caa2 | CCC | CCC |
| | 0.5 | " | Caa3 | CCC- | CCC- |
| | 0.0 | Extremely speculative | Ca | CC | CC |
| | 0.0 | Maybe in or extremely close to default | C | C+,C,C- | C+,C,C- |
| | 0.0 | Default | | D | D |

65.     As noted above, Moody's and S&P rated $26.1 billion and $26.2 billion,

respectively, of the $27 billion Certificates issued pursuant to the Offerings at issue in this

Complaint.  At the time these Certificates were issued, Moody's assigned its highest investment

grade rating of "Aaa" to 95.22%, or $24.86 billion, of the Moody's-rated Certificates, and S&P

assigned its highest investment grade rating of "AAA" to 95.22%, or $24.90 billion, of the S&P-

rated Certificates.  As a general matter, a rating downgrade of even one level – *e.g.,* from AAA

29

to AA or from Aaa to Aa – is considered material to the financial condition of the rated entity or security.  Here, the magnitude of the Certificate downgrades is unprecedented.  The Certificates have been downgraded as many as the maximum 23 levels – with, for example, 100% of Certificates initially rated AAA having now been downgraded to "Ba1" or below, meaning these Certificates were not only designated "junk," but are considered in danger of "imminent default." The remaining Certificate tranches have fared no better since 100% of the $27 billion of Certificates at issue herein have been downgraded to speculative or "junk" status.  Furthermore, all of the Certificates rated in the Aa and A range by Moody's at issuance have been downgraded to CC and below – from "very high grade" and "upper medium" securities to "extremely speculative" junk bonds.  This historic and dramatic reversal in the financial assessment of the Certificates by the Rating Agencies underscores that these securities were defective from the outset.

**E.    Investigations and Disclosures Subsequent to the Offerings Confirm That HFN Disregarded Stated Mortgage Loan Underwriting Guidelines**

66.    HFN was a principal originator for all 41 Offerings subject to this action.  HFN was an indirect subsidiary of GMAC and a direct wholly-owned subsidiary of RCC.  HFN was founded in 1995 after RCC was purchased by GMAC, and has since served as RCC's primary wholesale lender.

67.    Following issuance of the Certificates, disclosures began to emerge which further reflected HFN's systemic disregard for the underwriting guidelines set forth in the Offering Documents, its practices and policies of favoring riskier, fee-driven mortgage lending including sub-prime, Alt-A and option-ARM (hybrid adjustable rate or negative amortization) mortgage loans and inflating revenue via hidden prepayment penalties and fees.

68.     In mid-2008, the Federal Trade Commission (the "FTC") commenced an investigation into HFN's policies and practices after an FTC staff review of HFN's mortgage loan data report pursuant to the Home Mortgage Disclosure Act, 12 U.S.C. §§ 2801-2810, indicated that African American and Hispanic borrowers paid more for mortgage loans than non-Hispanic Whites.   According to a letter from the FTC to HFN's counsel, the investigation focused on whether the underwriting risk and the credit characteristics of the borrowers justified the reported disparities in loan price.

> Homecomings originated the vast majority of its loans through independent brokers and Homecomings' policy and practice was to set the risk-based price and other terms of its brokered loans.  In addition, Homecomings' policy and practice was to allow brokers to assess discretionary charges on these loans, within certain limits set by Homecomings.  These discretionary charges took the form of (1) fees charged at the time of origination, including broker points and fees, and (2) higher interest rates, in return for which Homecomings paid brokers yield spread premiums.

> Based on an extensive investigation, which included obtaining and analyzing Homecomings' full and complete loan data, the staff's statistical analyses of the data show that, on average, Homecomings charged African-American and Hispanic borrowers substantially more for home purchase and refinance loans than similarly-situated non-Hispanic whites.  ***The staff further determined that these disparities were caused by Homecomings' policy and practice of allowing its brokers broad discretion to determine the amount of discretionary fees charged to borrowers in addition to the risk-based price.  The staff concluded that the disparities in these discretionary charges are substantial, statistically significant, and cannot be explained by any legitimate underwriting or credit characteristics in violation of the FCOA and the FTC Act.***

69.     Before the FTC could complete its investigation, on September 3, 2009, RCC announced that it was shutting its wholesale mortgage origination operations, thereby closing down HFN, as well as its retail operations, GMAC Mortgage, LLC ("GMACM").  In a January 22, 2009 FTC letter closing the investigation, the FTC explained:

> During the course of this investigation, Homecomings ceased originating mortgage loans and stated it has no intention to resume mortgage lending in the future.  In addition, Residential Capital, LLC ("ResCap"), an indirect parent

31

company of Homecomings, filed a 10-Q Quarterly report for the third quarter of 2008 for ResCap and its direct and indirect subsidiaries, including Homecomings (collectively, the "Company"), which states that the ability of the Company to continue as a going concern is in substantial doubt.  The 10-Q further notes that the Company is heavily dependent on its own indirect parent, GMAC, LLC, for funding and capital support and that there can be no assurance that such support will continue.   Because of these developments and based on additional information provided by the Company regarding its financial status, the staff has closed the investigation.   However, the staff will continue to monitor future developments concerning Homecomings, including whether GMAC's recent conversion to a bank holding company and its receipt of financial assistance from the U.S. Department of the Treasury, may affect Homecomings' operating and financial status.  If warranted by materially changed circumstances, the staff will take appropriate action, including the reopening of this investigation.

70.    In a March 5, 2009 article titled "Shaky Loans May Spur New Foreclosure Wave," the *Portland Tribune* recounted the events leading up to the massive failures throughout the U.S. mortgage lending industry – including the role of HFN:

> "In order to keep your market share, you had to be more aggressive," said Tim Boyd, who sold subprime loans in the Portland area for six years and then Alt A loans for seven years for Homecomings Financial.

> "The main focus was doing Alt A because that's where the money was," said Boyd, who left the industry.  A loan officer arranging a $300,000 Option ARM loan could collect $10,500 in fees, he said.

> Lenders could unload shaky loans by selling them to investors, who often resold them in what amounted to a worldwide game of financial musical chairs.  Wall Street's insatiable appetite for more loans kept the pipeline filled, even if the deals weren't always sound.

> "The V.P.s came down to the office beating the drums about Option ARMs," urging mortgage brokers to sell them to customers, Ridge said. "I had Wachovia march through there; I had GMAC."

>       *             *             *

> He said he knows of loan officers who'd tell title agents to keep quiet about Option ARM loan provisions during document-signing time.

> "They'd tell the title officer, 'Don't go over this; just glean through it quickly and get the thing signed.'"

32

Tim Boyd said he drew the line at selling Option ARMs because he saw how that could get people into trouble. "It made me sick," he said.

71.    In late 2002, the West Virginia Attorney General's Office began an investigation into predatory lending practices of HFN and another subprime mortgage lender, Fairbanks Capital Corp ("Fairbanks").  The investigation led to a June 25, 2005 settlement between the WVAG, Fairbanks and HFN, pursuant to which Fairbanks and HFN agreed to pay $773,000 in restitution, account credits and refunds for approximately 2,300 West Virginia consumers who had been charged unlawful fees and who lost their homes through "questionable foreclosures."

72.    In a September 11, 2006 article titled "Nightmare Mortgages," *BusinessWeek Magazine* described HFN's lending policies as using outrageous pre-payment penalties to keep borrowers stuck in pay-option ARM loans and their using "fine-print" in contracts to hide disclosures:

> Gordon Burger is among the first wave of option ARM casualties. The 42-year-old police officer from a suburb of Sacramento, Calif., is stuck in a new mortgage that's making him poorer by the month.  Burger, a solid earner with clean credit, has bought and sold several houses in the past. In February he got a flyer from a broker advertising an interest rate of 2.2%.  It was an unbeatable opportunity, he thought.  If he refinanced the mortgage on his $500,000 home into an option ARM, he could save $14,000 in interest payments over three years.  Burger quickly pulled the trigger, switching out of his 5.1% fixed-rate loan.  "The payment schedule looked like what we talked about, so I just started signing away," says Burger. He didn't read the fine print.
>
> After two months Burger noticed that the minimum payment of $1,697 was actually adding $1,000 to his balance every month.  "I'm not making any ground on this house; it's a loss every month," he says.  ***He says he was told by his lender, Minneapolis-based Homecoming Financial, a unit of Residential Capital, the nation's fifth-largest mortgage shop, that he'd have to pay more than $10,000 in prepayment penalties to refinance out of the loan. If he's unhappy, he should take it up with his broker, the bank said.  "They know they're selling crap, and they're doing it in a way that's very deceiving," he says. "Unfortunately, I got sucked into it."***  In a written statement, Residential said it couldn't comment on Burger's loan but that "each mortgage is designed to meet the specific financial needs of a consumer."

33

(Emphasis added).

**F.**     **The Offering Documents Failed to Disclose the Underwriter Defendants' Inadequate Due Diligence with Respect to Compliance with <u>Stated Mortgage Loan Underwriting Guidelines</u>**

73.     The Registration Statement provided that the loan underwriting guidelines used to originate the loan collateral is as specifically set forth in each of the Prospectus Supplements. (¶¶ 133-158).   The Prospectus Supplements provide that the mortgage loans underlying the Certificates were originated pursuant to RFC's stated underwriting guidelines adhered to by HFN in originating the mortgage loans.  *Id.*

74.     As Underwriters of the Offerings, the Underwriter Defendants conducted inadequate due diligence with respect to whether Residential Capital and HFN complied with the loan underwriting guidelines described in the Prospectus Supplements.

75.     Very little if any due diligence was actually conducted by the Underwriter Defendants themselves.   The Underwriter Defendants contracted with external firms to review whether the loans included in MBS that they underwrote were in compliance with the loan originators' represented standards.   Residential Capital was a noted client of Clayton Holdings, Inc. ("Clayton") and Bohan Group LLC ("Bohan"), among other due diligence firms.

76.     In June 2007, the NYAG subpoenaed documents from Clayton and Bohan related to their due diligence efforts on behalf of the investment banks, such as Residential Capital, that underwrote mortgage-backed securities.   The NYAG, along with Massachusetts, Connecticut and the SEC (all of which also subpoenaed documents) have investigated whether investment banks held back information they should have provided in the disclosure documents related to the sale of mortgage-backed securities to investors.

77.    In a January 12, 2008 article titled "Inquiry Focuses on Withholding of Data on

Loans," the *New York Times* reported:

> An investigation into the mortgage crisis by New York State prosecutors is now focusing on whether Wall Street banks withheld crucial information about the risks posed by investments linked to subprime loans.
>
> Reports commissioned by the banks raised red flags about high-risk loans known as exceptions, which failed to meet even the lax credit standards of subprime mortgage companies and the Wall Street firms.  But the banks did not disclose the details of these reports to credit-rating agencies or investors.
>
> The inquiry, which was opened last summer by New York's attorney general, Andrew M. Cuomo, centers on how the banks bundled billions of dollars of exception loans and other subprime debt into complex mortgage investments, according to people with knowledge of the matter.  Charges could be filed in coming weeks.
>
> *        *        *
>
> The inquiries highlight Wall Street's leading role in igniting the mortgage boom that has imploded with a burst of defaults and foreclosures.  The crisis is sending shock waves through the financial world, and several big banks are expected to disclose additional losses on mortgage-related investments when they report earnings next week.
>
> As plunging home prices prompt talk of a recession, state prosecutors have zeroed in on the way investment banks handled exception loans.  In recent years, lenders, with Wall Street's blessing, routinely waived their own credit guidelines, and the exceptions often became the rule.
>
> It is unclear how much of the $1 trillion subprime mortgage market is composed of exception loans.  Some industry officials say such loans made up a quarter to a half of the portfolios they saw.  In some cases, the loans accounted for as much as 80 percent.  While exception loans are more likely to default than ordinary subprime loans, it is difficult to know how many of these loans have soured because banks disclose little information about them, officials say.
>
> Wall Street banks bought many of the exception loans from subprime lenders, mixed them with other mortgages and pooled the resulting debt into securities for sale to investors around the world.
>
> *        *        *

35

Mr. Cuomo, who declined to comment through a spokesman, subpoenaed several Wall Street banks last summer, including Lehman Brothers and Deutsche Bank, which are big underwriters of mortgage securities; the three major credit-rating companies: Moody's Investors Service, Standard & Poor's and Fitch Ratings; and a number of mortgage consultants, known as due diligence firms, which vetted the loans, among them Clayton Holdings in Connecticut and the Bohan Group, based in San Francisco. Mr. Blumenthal said his office issued up to 30 subpoenas in its investigation, which began in late August.

*      *      *

To vet mortgages, Wall Street underwriters hired outside due diligence firms to scrutinize loan documents for exceptions, errors and violations of lending laws. But Jay H. Meadows, the chief executive of Rapid Reporting, a firm based in Fort Worth that verifies borrowers' incomes for mortgage companies, said lenders and investment banks routinely ignored concerns raised by these consultants,

"Common sense was sacrificed on the altar of materialism," Mr. Meadows said, "We stopped checking."

78.    On January 27, 2008, Clayton revealed that it had entered into an agreement with

the NYAG for immunity from civil and criminal prosecution in the State of New York in

exchange for agreeing to provide additional documents and testimony regarding its due diligence

reports, including copies of the actual reports provided to its clients. On the same day, both the

*New York Times* (Anderson, J. and Bajaj, V., "Reviewer of Subprime Loans Agrees to Aid

Inquiry of Banks," Jan. 27, 2008), and the *Wall Street Journal* ran articles describing the nature

of the NYAG's investigation and Clayton's testimony. The *Wall Street Journal* reported that the

NYAG's investigation is focused on "the broad language written in prospectuses about the risky

nature of these securities changed little in recent years, even as due diligence reports noted that

the number of exception loans backing the securities was rising." According to the *New York

Times* article, Clayton told the NYAG "that starting in 2005, it saw a significant deterioration of

lending standards and a parallel jump in lending expectations" and "some investment banks

directed Clayton to halve the sample of loans it evaluated in each portfolio."

36

79.     A March 23, 2008 *Los Angeles Times* article reported that Clayton and Bohan employees "raised plenty of red flags about flaws [in subprime home loans] so serious that mortgages should have been rejected outright – such as borrowers' incomes that seemed inflated or documents that looked fake – but the problems were glossed over, ignored or stricken from reports" as follows:

> The reviewers' role was just one of several safeguards – including home appraisals, lending standards and ratings on mortgage-backed bonds – that were built into the country's mortgage-financing system.
>
> But in the chain of brokers, lenders and investment banks that transformed mortgages into securities sold worldwide, no one seemed to care about loans that looked bad from the start.  Yet profit abounded until defaults spawned hundreds of billions of dollars in losses on mortgage-backed securities.
>
> "The investors were paying us big money to filter this business," said loan checker Cesar Valenz.  "It's like with water.  If you don't filter it, it's dangerous. And it didn't get filtered."
>
> As foreclosures mount and home prices skid, the loan-review function, known as "due diligence," is gaining attention.
>
> The FBI is conducting more than a dozen investigations into whether companies along the financing chain concealed problems with mortgages.  And a presidential working group has blamed the subprime debacle in part on a lack of due diligence by investment banks, rating outfits and mortgage-bond buyers.

*The Los Angeles Times*, "Subprime Watchdogs Ignored," March 23, 2008.

80.     Moreover, while underwriters would have sought to have Clayton review 25% to 40% of loans in a pool that was going to be securitized earlier in the decade, by 2006 the typical percentage of loans reviewed for due diligence purposes was just 5-7%.  Bohan's President, Mark Bohan, stated that "[b]y contrast [to investment banks in RMBS deals], buyers who kept the mortgages as an investment instead of packaging them into securities would have 50% to 100% of the loans examined."

**G.  Due Diligence Reports Commissioned and Reviewed by the Underwriters *Prior* to Each Offering Revealed That a Highly Material Portion of the Loans in *Every* Offering Failed to Comply with Underwriting Guidelines**

81.     The limited discovery done in this action to date confirms that the due diligence of the Offerings was inadequate; but even the limited activities that were performed provided the Underwriter Defendants with sufficient evidence to conclude that – to a significant extent warranting disclosure to investors at the very least – the mortgage loan collateral did not comply with the underwriting guidelines purportedly relied upon to originate the loans.

82.     Prior to each Offering, Defendants engaged third-party due diligence firms such as Clayton, Bohan, Office Tiger Global Real Estate Services ("Tiger"), and Opus Capital Markets Consultants, LLC ("Opus") to examine a sample number of loans comparing the contents of the loan file to the applicable underwriting guidelines for that loan.  These firms assigned a "1" designation to loans that were fully compliant with the guidelines; a "2" designation to loans that were deficient but still compliant because of compensating factors; and a "3" designation to loans that were materially non-compliant.  A finding that 2-3% of the loans were non-compliant category "3" loans was deemed acceptable.  An internal email produced by Defendants in this litigation confirmed that the "normal level of declines [*i.e.*, "3" loans] was 2%-3%."  Unbeknownst to investors, however, the level of "3" loans in the reunderwriting of sample loans in connection with the Offerings was consistently and exponentially higher than 2-3%.  The principal purpose of the sampling done by third-party due diligence firms was to determine whether loans in the pool complied with underwriting guidelines.

83.     Upon receipt of adverse reunderwriting results Defendants failed to either halt the Offering until it could be determined whether adverse results existed throughout the entire

38

mortgage loan pool or, if the investment bank wished to proceed with the Offering, to disclose the adverse results to the Rating Agencies and to investors in the Prospectus Supplement. Defendants did neither. ███████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

84.   ████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████

85.   ████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

86.   ████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████

**H.    Governmental Agency Investigations Subsequent
to the Offerings Further Confirm Faulty Loan
Origination and Securitization Practices**

87.    In August 2007, following reports of defaults in mortgage loans underlying various MBS, downgrades of such MBS and potential downgrades of additional MBS in the future, and the resulting illiquidity in the credit markets, the President of the United States commissioned the Secretary of the Treasury, the SEC and the Commodities Futures Trading Commission ("CFTC") (hereinafter referred to as the "President's Working Group" or the "PWG") to investigate the causes of the market turmoil.  After a seven-month investigation, the PWG issued its report on March 13, 2008.  The PWG found as follows:

- A significant erosion of market discipline by those involved in the securitization process, including *originators, underwriters, credit rating agencies, and global investors,* related in part to failures to provide or obtain adequate risk disclosures;

- The turmoil in financial markets clearly was triggered by a *dramatic weakening of underwriting standards for U.S. subprime mortgages*…

(Emphasis added).

88.    Further, as noted, relatively soon after issuance, the delinquency and foreclosure rates of the Certificate collateral began to increase.  This performance was an indication to S&P of pervasive underwriting failures in the origination of the collateral which ultimately led to widespread and deep downgrades of most of the Certificate classes.  On or about July 10, 2007, S&P publicly announced it was revising the methodologies used to rate numerous MBS certificates because the performance of the underlying collateral "called into question" the accuracy of the loan data.  This announcement triggered several governmental investigations which only began reporting their findings in 2008.

40

89.     S&P announced that it was revising its methodology assumption to require increased "credit protection" for rated transactions.  S&P reiterated that it would also seek in the future to review and minimize the incidence of potential underwriting abuse given "the level of *loosened underwriting* at the time of loan origination, misrepresentation and speculative borrower behavior reported for the 2006 ratings."

90.     One day later, on July 11, 2007, Moody's announced it was also revising its methodology used to rate the Certificates, and anticipated Certificate downgrades in the future.  Moody's did in fact significantly downgrade most of the Certificate classes, noting "aggressive underwriting" used in the origination of the collateral.

91.     Further, as set forth more fully below, disclosures emerged well after the issuance of the Certificates with respect to each of the Originators which further evidenced that they had engaged in loan underwriting practices which were wholly inconsistent with the guidelines set forth in the Registration Statement and Prospectus Supplements.  (¶¶ 92-132).

I.      **Subsequent Disclosures Evidence Underwriter Defendants' Write-Downs and Near Collapse Due to Their Role in Securitizing and <u>Underwriting Mortgage-Backed Securities</u>**

92.     Each of the Underwriter Defendants maintained operations through which they conducted issuance and sale to investors of massive quantities of MBS in 2005 and through 2007.  These securities were collateralized with sub-prime and Alt-A mortgage loans originated under conditions which failed to comply with stated mortgage loan underwriting guidelines.  As delinquencies, foreclosures and repossessions began to skyrocket, all of the Underwriter Defendants eventually were forced to write-down a significant portion of the value of their mortgage-related securities holdings, have been and continue to be subject to Federal and State

41

investigations and in some cases, have been forced into bankruptcy from the resultant mortgage-related losses.

### 1.     **Defendant Ally Securities**

93.     As set forth in detail above, Ally Securities is a registered broker-dealer engaged at all relevant times in the business of underwriting and selling securitized MBS to institutional investors.  Ally Securities is an affiliate of Ally Bank.  According to the RCC (referred to at times as "ResCap") website, Ally Securities was one of the first mortgage conduits in the U.S. to focus on buying and securitizing single-family, jumbo mortgages, loans with balances above the purchasing authority of the government-sponsored enterprises.

94.     In 2005, GMAC-RFC was ranked as the fifth largest non-agency MBS issuer with $56.93 billion in volume, a 4.8% increase over its 2004 level of $42.336 billion.  In 2006, GMAC-RFC was rated by *IMF* as the eighth largest mortgage securities producer, with $66.24 billion in mortgage securities volume and a 3.2% market share.  Of that $66.24 billion, $64.229 billion was from non-agency MBS.

95.     On July 30, 2007, GMAC and RCC both announced losses as a result of their residential mortgage business.  GMAC's net income fell to $293 million from $787 million a year earlier.  RCC had a loss of $254 million, compared with a profit of $548 million a year earlier, because of loans to buyers with poor credit ratings.

96.     To make matters worse, as reported by *Reuters* on July 31, 2008, GMAC posted a $2.48 billion second quarter loss as a result of write-downs and mounting losses at its mortgage lending unit.

97.     On February 22, 2008, as reported by *Forbes Magazine*, S&P announced that it would be downgrading RCC as a result of mounting mortgage losses.

GMAC and its Residential Capital mortgage unit were cut several notches deeper into junk status by Standard & Poor's, which said mounting mortgage losses might require new capital injections from General Motors and Cerberus Capital Management.

98.     On March 29, 2008, *Forbes* announced "GMAC had reported a heavy first-quarter loss, making for 6 consecutive losses of its kind."

GMAC's loss increased to $589.0 million from $305.0 million a year earlier. The dent included an $859.0 million loss at its subsidiary Residential Capital. It was the mortgage unit's sixth consecutive quarterly loss, though the amount lost fell from $910.0 million last year.

99.     On December 24, 2008, as reported by *Reuters*, GMAC was forced to seek federal approval to become a bank holding company, giving it access to government lending programs and helping it stave off bankruptcy.  As reported by the *New York Times*, the U.S. Department of the Treasury invested $5 billion in GMAC LLC on December 29, 2008 from its Troubled Assets Relief Program.  At the same time, the federal government gave GM $1 billion so that the company could support GMAC LLC and invest in its financing arm.  On May 21, 2009, according to the *Detroit News*, the U.S. Department of the Treasury became a majority stake holder in GMAC LLC when it invested an additional $7.5 billion in the company, aiming to support the struggling lender and improve its ability to make loans.  On December 30, 2009, as reported by the *New York Times*, the U.S. Department of the Treasury invested an additional $3.8 billion in GMAC LLC, raising the government's total direct investment in the company to $16.3 billion.  Including the $1 billion given to GM to support GMAC LLC, the government's support of GMAC LLC totaled $17.3 billion.  According to *Bloomberg News*, on May 10, 2010, GMAC, Inc. re-branded itself as Ally Financial, Inc.

43

100. As alleged herein, Ally Securities failed to conduct proper due diligence and perform necessary oversight functions in the underwriting, securitization and preparation of the Offering Documents for the Offerings complained of herein.

### 2. **Defendant GSC**

101. Defendant GSC is an investment banking firm that through its various subsidiaries, provides a range of investment banking, securities and investment management services. As an investment bank, GSC is an underwriter of a wide range of securities and other financial instruments, including mortgage-related securities. According to its 2007 Annual Report, GSC's investment banking revenue skyrocketed from $3.67 billion in 2005, to $5.629 billion in 2006 and $3.671 billion in 2007. In fact, On March 5, 2005, *Bloomberg News* labeled Goldman Sachs Group, Inc. the world's most profitable securities firm. In that year, GSC was ranked first in U.S. IPO underwriting.

102. In 2005, *IMF* ranked GSC as the ninth largest non-agency MBS issuer and the sixth largest non-agency MBS underwriter with $38.772 billion and $69.432 billion in volume, respectively. A year later, GSC was ranked the twelfth largest mortgage securities producer with $47.5 billion in volume. In 2007, as reported by *IMF*, GSC issued $3.78 billion in subprime securities alone and ranked seventh among the largest prime and alt-A underwriters with $28.224 billion in volume.

103. GSC made most of its record profits during this time by betting against the U.S. mortgage market. On December 15, 2007, the British newspaper, *The Times*, reported that while key rivals were losing millions on investments, GSC had raked in over $4 billion by betting on the collapse of the U.S. subprime market.

44

They believed that mortgage lending criteria had become so lax that a jump in defaults on high-risk home loans was inevitable and would drag down the value of the bonds that they backed.

104.    However, GSC's underwriting practices were as suspect as the rest of the industry.  On January 11, 2007, *CNN* reported that the City of Cleveland had filed suit against GSC and twenty other financial institutions alleging that the banks had caused the sub-prime crisis by creating a process of offering and securitizing loans given to borrowers who could not afford them.

105.    On January 30, 2008, the FBI and SEC launched a joint investigation into 14 investment banks, loan providers and developers as part of a crackdown focusing on the subprime mortgage crisis.  As reported that same day by the *Daily Telegraph*, GSC confirmed its involvement in the investigation.

Goldman Sachs and Morgan Stanley, two of Wall Street's largest investment banks, have confirmed for the first time that they are embroiled in investigations into the U.S. sub-prime mortgage collapse.

In its annual report for the year to November 30, Goldman said it had "received requests for information from various governmental agencies and self-regulatory organizations relating to sub-prime mortgages, and securitizations, collateralized debt obligations and synthetic products related to sub-prime mortgages."

106.    *BusinessWire* reported on March 18, 2008 that GSC's February 2008 quarterly report disclosed a 40% drop in underwriting revenues for the investment bank.  GSC attributed this to the significantly lower net revenues in debt underwriting.

107.    In December 2007, the Massachusetts Attorney General launched an investigation into the securitization of subprime loans.  The investigation focused on the industry practices involved with issuance and securitization of subprime loans to Massachusetts consumers. According to a press release issued by the Massachusetts Attorney General's Office,

The Office is investigating whether securitizers may have:

45

- facilitated the origination of "unfair" loans under Massachusetts law;
- failed to ascertain whether loans purchased from originators complied with the originators' stated underwriting guidelines;
- failed to take sufficient steps to avoid placing problem loans in securitization pools;
- been aware of allegedly unfair or problem loans;
- failed to make available to potential investors certain information concerning allegedly unfair or problem loans, including information obtained during loan diligence and the pre-securitization process, as well as information concerning their practices in making repurchase claims relating to loans both in and out of securitizations.

108.    On May 11, 2009, it was reported by both the *New York Times* and *Wall Street Journal* that GSC had agreed to provide $50 million in relief to Massachusetts sub-prime mortgage holders and pay an additional $10 million to the state to end the investigation into the company.  According to the *New York Times* article,

> At a news conference, [the Massachusetts AG] said that the problem was industry-wide and that the Goldman settlement would provide "much needed relief for many in Massachusetts." Even so, she also criticized what she called predatory lending that was encouraged by Wall Street firms that bought individual subprime mortgages and repackaged them into securitized loans for investors.

109.    On December 16, 2008, as reported by the *New York Times*, GSC was forced to take its first quarterly loss, $2.12 billion, since going public in 1999.

110.    A detailed complaint for violations of the federal securities laws was filed against GSC on February 6, 2009 in the U.S. District Court for the Southern District of New York. *Public Employee's Retirement Sys. of Miss. v. Goldman Sachs Group, Inc.,* No. 09-1110. According to the GSC Class Action Complaint (the "GSC Complaint" or the "GSC Compl.").

> Wall Street aggressively pushed into the complex, high-margin business of packaging mortgages and selling them to investors as MBS, including mortgage pass through certificates.  This aggressive push created a boom for the mortgage lending industry.  By buying and packaging mortgages, Wall Street enabled the lenders to extend credit even as the dangers grew in the house market.  At the center of the escalation was Wall Street's partnership with subprime lenders. This relationship was a driving force behind the once soaring home prices and the

46

spread of exotic loans that are now defaulting and foreclosing in record numbers. (GSC Compl., ¶ 86).

Each of the Individual Defendants, Issuing Defendants and Underwriter Defendants failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that statements contained in the Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading. (GSC Compl., ¶ 124).

111. As alleged herein, GSC failed to conduct proper due diligence and perform necessary oversight functions in the underwriting, securitization and preparation of the Offering Documents for the Offerings complained of herein.

### 3. **Defendant DBS**

112. Defendant DBS serves as the U.S. investment banking and securities arm of German Deutsche Bank AG. DBS was founded in 1973 as a subsidiary of Deutsche Bank AG. DBS is an SEC-registered broker-dealer and is a member of NASD and the New York Stock Exchange.

113. In 2005, DBS was ranked twenty-second in non-agency MBS issuers by *IMF*, issuing more than $17 billion. Moreover, in that same year, DBS was ranked eighth among non-agency MBS underwriters with $7.05 billion in volume. This was a drastic increase from its 2004 underwriting volume of $29.9 billion. In 2006, DBS climbed two spots among non-agency MBS underwriters with $72.765 billion. In that same year, *IMF* ranked DBS and its $25.328 billion in volume as the twenty-first largest mortgage securities producer and the sixth largest home equity loan security underwriter with $29.46 billion in volume. In 2007, DBS underwrote $11.94 billion and ranked eighth among the top subprime MBS underwriters.

114. On October 3, 2007, the *New York Times* reported that DBS expected to write down $3.1 billion in loans and mortgage-backed assets. On July 31, 2008, as reported by

*Reuters*, Deutsche Bank AG announced another $3.6 billion in write-downs primarily due to DBS' over exposure to U.S. residential MBS.  The July 2008 write-down brought DBS's total write downs to more than $11 billion.

115.    On June 27, 2008 a lawsuit was filed in the Supreme Court of the State of New York alleging violations of federal securities law against DBS.  *Massachusetts Bricklayers and Masons Trust Fund v. Deutsche Alt-A Securities, Inc.,* No. 08-CV-3178(LDW) (removed to the Eastern District of New York on August 5, 2008) (the "Bricklayers Complaint" or "Bricklayers Compl.").  The Bricklayers Complaint alleges that DBS, as underwriter of the mortgage-backed certificates, failed to perform adequate due diligence on the mortgage loans of DBS including in its MBS offerings.

116.    On March 20, 2009, another lawsuit, this time against Deutsche Bank AG, was filed in the U.S. District Court for the Southern District of New York alleging that the Bank, its subsidiaries and its officers violated the Securities Act by issuing false and misleading registration statements, prospectuses and other documents.  *Kaess et al v. Deutsche Bank AG et al.*, No. 09-CV-2556 (the "Kaess Complaint" or "Kaess Compl.").   The Kaess Complaint alleged, *inter alia*, that Deutsche Bank AG, with respect to its mortgage-related securities:

- failed to properly record provisions for credit losses, residential mortgage-backed securities, commercial real estate loans…
- The Company's internal controls were inadequate to prevent it from improperly recording provisions for credit losses, residential mortgage-backed securities, commercial real estate loans…

Kaess Compl., ¶ 47 (emphasis added).

117.    As alleged herein, DBS failed to conduct proper due diligence and perform necessary oversight functions in the underwriting, securitization and preparation of the Offering Documents for the Offerings complained of herein.

4.  **Defendant CITI**

118.   Defendant Citigroup Global Markets, Inc. ("CITI") is the registered broker-dealer of the global banking giant Citigroup, Inc. ("Citigroup").  As one of the top underwriters of MBS in the last five-years, Citigroup has been one of the major contributors to the collapse of the U.S. sub-prime mortgage market and the current economic crisis.  In 2005, CITI was ranked by *IMF* as the seventh largest MBS issuer having issued $68.305 billion in MBS.  In that same year, CITI issued 17.9 billion of non-agency MBS alone.  In 2006, CITI issued $20 billion of non-agency MBS, and was ranked as the sixth largest producer of MBS with a volume of $71.782 billion.

119.   On January 15, 2008 Citigroup reported its greatest loss in its 196-year history as it wrote off $18.1 billion and announced $9.8 billion in sub-prime related losses for the fourth quarter.  On April 18, 2008 Citigroup declared another write-down of an additional $15.2 billion.

120.   On March 7, 2008 the House Oversight and Government Reform Committee subpoenaed CITI's former CEO, Charles Prince, seeking information regarding CITI's role in the MBS financial meltdown.  According to a March 7, 2009 article in the *New York Times*:

> Under Mr. Prince, Citigroup charged aggressively into the trading of mortgage-backed securities that were the hot product on Wall Street at the time.  As late as the summer of 2007, as evidence mounted of a collapse in the housing market, Mr. Prince declared that the bank was "still dancing."
>
> Not much later, the music ended, and Mr. Prince was out in November of that year as the bank posted a $5.9 billion loss.
>
> That turned out to be the first of many.  On Jan. 16, 2009, Citigroup announced an $8.29 billion fourth-quarter loss, bringing its total losses for 2008 to $27.7 billion, among the largest in corporate history.

121.   On November 5, 2008, a class action complaint for violations of the federal securities laws was filed against CITI in the U.S. District Court for the Southern District of New York, alleging that, *inter alia*, in certain public offering documents, CITI materially understated

49

loss reserves for the Company's $213 billion portfolio of residential mortgage loans.  *In re Citigroup Bond Litigation*, No. 08-CV-9522 ("CITI Complaint" or "CITI Compl").  The CITI Complaint states in part:

> Many of these mortgages carried a high risk of default because they were made to borrowers who did not document their income or who possessed especially low credit scores, or because the loans were drawn against the equity value of a property at a time when housing prices were declining precipitously.  While accounting rules required Citigroup to take reserves based on losses that were "likely" to occur, the Company allowed its reserves to track – and at times to be less than – the amount of loans that had already defaulted.  Further, despite the Company's rapidly expanding portfolio of particularly risky loans, coupled with the collapse of the housing market, Citigroup reduced its allowance for loan losses as a percentage of total loans in 2006 and 2007.

CITI Compl., at ¶ 8.

122.    In the latter part of 2008, in order to remain viable, CITI received $52 billion in cash from the Government's Troubled Asset Relief Program ("TARP") and handed over 36% of ownership to the federal government.

123.    As alleged herein, CITI failed to conduct proper due diligence and perform necessary oversight functions in the underwriting, securitization and preparation of the Offering Documents for the Offerings complained of herein.

**5.    Defendant UBS**

124.    Defendant UBS, a wholly-owned subsidiary of UBS AG, is an SEC-registered broker-dealer which engages in investment banking activities around the world, including underwriting, financing and asset management.  In 2005, as reported by IMF, UBS issued $12.75 billion of MBS and was the seventh largest underwriter of non-agency MBS ($58.536 billion). The following year, UBS broke into the top 25 non-agency issuers, issuing $12.752 billion of MBS, and was the thirty-fifth largest MBS producer, producing $12.847 billion of MBS.  In 2007, UBS issued $3.05 billion of subprime MBS.

50

125.    In 2005, according to its Annual Audit Report filed with the SEC, UBS ended the year with $127 billion in total assets – $26 billion of which were mortgage-backed obligations. Furthermore, in 2006, according to its Annual Audit Report, UBS' assets at year-end totaled $153 billion, of which over $36 billion were in the form of mortgage-backed obligations.  And in 2007, the investment bank's assets totaled $156 billion with $33.5 billion in the form of mortgage-backed obligations.

126.    By 2008, however, the one-time massive global investment bank now valued its mortgage-backed obligations at only $8 billion and reported total assets of only $54 billion – a 76% decline in total mortgage-backed obligations and a 65% decline in total assets as compared to 2007.

127.    In December 2007, UBS issued a profit warning, expecting write downs related to sub-prime mortgage losses and estimating the figure to reach upwards of $10 billion.

128.    In January 2008, the *Wall Street Journal* reported that due to massive exposure to the U.S. housing and mortgage markets, UBS was forced to take substantial write-downs resulting from sub-prime mortgage-related losses.

> UBS, the world's largest wealth manager, announced the need to write down another $4 in subprime-related losses. This new write-down brings the total for UBS subprime losses to over $18.4 billion. Subprime-related losses pushed the company to its worst year of performance in its institutional history."

129.    UBS has written off nearly $38 billion since the subprime crisis began, over $18 billion of which came in the first quarter of 2008.

130.    In April 2008, a *New York Times* article reported that "UBS, which has written off more debt from the sub-prime crisis than any other bank, conceded in a report on Monday that a blind drive for revenue led it to take more risks than it should have."

51

131.    The *Wall Street Journal* reported on February 2, 2008 that a federal criminal investigation of UBS had been commenced, focusing on practices of misleading investors about the value of its mortgage-related holdings.  This report states:

> A U.S. attorney's office investigation as to whether UBS AG criminally misled investors by posting inflated prices of its mortgage bond holdings, despite knowing that the valuations had dropped.
>
> An SEC probe into similar "mismarking" issues surrounding the bank's massive holdings of mortgage securities. The SEC case has recently been upgraded to a formal investigation.

132.    As alleged herein, UBS failed to conduct proper due diligence and perform necessary oversight functions in the underwriting, securitization and preparation of the Offering Documents for the RALI Offerings complained of herein.

## V.

## MATERIAL MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS

**A.    Defendants' Material Misstatements and Omitted Information
Regarding Stated Mortgage Loan Underwriting Guidelines**

**1.    The Registration Statements**

133.    The Registration Statements informed investors that each originator will have applied strict procedures to evaluate the loans it had originated.

> The depositor expects that the originator of each of the mortgage loans will have applied, consistent with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral.

Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed March 3, 2006, at 12; *cf.*, Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed April 3, 2007, at 18.

134.    ***Omitted Information***: This statement failed to disclose that the originators made little or no attempt to evaluate the borrowers' credit standing and repayment ability.  As has

52

emerged, all of the originators loosened or totally disregarded their stated underwriting guidelines in an effort to increase origination volume.   This statement also failed to disclose that, when Defendants learned prior to the Offering date (from their inadequate due diligence) that a material percentage of the mortgage loans failed to comply with the guidelines, Defendants would go forward with the Offering without curing this problem or disclosing it to the Rating Agencies, investors, or the public.

135.    The Registration Statements each set forth the underwriting guidelines applied in the origination of the mortgage loan collateral underlying the Certificates.[8]   In terms of the "General Standards" applicable to the origination process, the Registration Statements state, in part:

> In most cases, under a traditional "full documentation" program, each mortgagor will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor.  As part of the description of the mortgagor's financial condition, the mortgagor will have furnished information, which may be supplied solely in the application, with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report that summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy…
>
> *If specified in the accompanying prospectus supplement, a mortgage pool may include mortgage loans that have been underwritten pursuant to a streamlined documentation refinancing program.  Such program permits some mortgage loans to be refinanced with only limited verification or updating of the underwriting information that was obtained at the time that the original mortgage loan was originated.*
>
> *If specified in the accompanying prospectus supplement, some mortgage loans may have been originated under "limited documentation," "stated documentation" or "no documentation" programs that require less documentation and verification than do traditional "full documentation" programs.  Under a limited documentation, stated documentation or no documentation program, minimal investigation into the mortgagor's credit*

---

[8]    Both Registration Statements and the Prospectus Supplements for Offerings in which the underlying collateral was originated by Residential Capital's own HFN include the identical language describing the Originator's "Underwriting Guidelines" and refer specifically to "The Program."

> *history and income profile is undertaken by the originator and the underwriting*
> *may be based primarily or entirely on an appraisal of the mortgaged property*
> *and the LTV ratio at origination.*

Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed March 3, 2006, at 12-13; *cf.,* Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed April 3, 2007, at 18.

136.   ***Omitted Information:*** In the industry, mortgage loans originated under streamlined or other "less than full-documentation" programs were referred to as "liar loans" which were much riskier than suggested by the Prospectus Supplements.   Specifically, Residential Capital took the information on the borrower application as true, performing little if any review of the underlying documentation, if any such documentation was required.   The computerized underwriting system employed by Residential Capital (and explained further below) did not have the ability to verify information entered into it by Residential Capital or directly by correspondent lenders, and only reviewed the information it was programmed to review.   Because little if any verification was required, borrower and mortgage broker fraud – or "lies" – were common in these types of applications and ignored by Residential Capital.   This statement also failed to disclose that, when Defendants learned prior to the Offering date that a material percentage of the mortgage loans failed to comply with the guidelines, Defendants would go forward with the Offering without curing this problem or disclosing it to the Rating Agencies, investors, or the public.

137.   The Registration Statements then set forth the process of review by the Sponsor/Seller, Defendant RFC, in determining whether or not the mortgage was originated in-line with its stated underwriting standards:

> The level of review by Residential Funding Corporation, if any, will vary
> depending on several factors.  Residential Funding Corporation, on behalf of the
> depositor, typically will review a sample of the mortgage loans purchased by
> Residential Funding Corporation for conformity with the applicable underwriting

54

standards and to assess the likelihood of repayment of the mortgage loan from the various sources for such repayment, including the mortgagor, the mortgaged property, and primary mortgage insurance, if any.  Such underwriting reviews will generally not be conducted with respect to any individual mortgage pool related to a series of certificates.

*      *      *

In addition, Residential Funding Corporation may conduct additional procedures to assess the current value of the mortgaged properties.  Those procedures may consist of drive-by appraisals, automated valuations or real estate broker's price opinions.  The depositor may also consider a specific area's housing value trends.  These alternative valuation methods may not be as reliable as the type of mortgagor financial information or appraisals that are typically obtained at origination.  In its underwriting analysis, Residential Funding Corporation may also consider the applicable Credit Score of the related mortgagor used in connection with the origination of the mortgage loan, as determined based on a credit scoring model acceptable to the depositor.

*      *      *

A portion of the mortgage loans typically will be reviewed by Residential Funding Corporation or by a designated third party for compliance with applicable underwriting criteria. …  Any determination of underwriting eligibility using an automated system will only be based on the information entered into the system and the information that the system is programmed to review.

Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed March 3, 2006, at 14--16; *cf.,* Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed April 3, 2007, at 19-22.

138.   ***Omitted Information:*** The above statement was misleading and omitted information regarding the level of scrutiny with which RFC and HFN examined the collateral and conducted due diligence.  As set forth above, Residential Capital, and RFC and HFN specifically, were more concerned with "pushing loans through" and increasing fees and profits from MBS securitizations than kicking-back loans to correspondent lenders.  Moreover, the sample size of the loans that Residential Capital did review was just a small percentage of the loans it acquired from HFN and correspondent lenders, from which only extreme outliers which fell outside acceptable parameters were dropped.  Regardless, Residential Capital farmed out

55

most of the "review" of the mortgage loan collateral to third-party firms, including Bohan and Clayton, which have publicly disclosed the severe deficiencies in the standards applied in underwriting and securitizing mortgage loan collateral throughout the relevant time period.  This statement also failed to disclose that, when Defendants learned prior to the Offering date that a material percentage of the mortgage loans failed to comply with the guidelines, Defendants would go forward with the Offering without curing this problem or disclosing it to the Rating Agencies, investors, or the public.

139.    Furthermore, the Registration Statements set forth borrower documentation and verification requirements for riskier loans such as ARMs or Buy-Down Mortgages:

> Once all applicable employment, credit and property information is received, a determination is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed mortgage loan and other expenses related to the home, including property taxes and hazard insurance, and other financial obligations and monthly living expenses.  ***ARM loans, Buy-Down Mortgage Loans, graduated payment mortgage loans and any other mortgage loans will generally be underwritten on the basis of the borrower's ability to make monthly payments as determined by reference to the mortgage rates in effect at origination or the reduced initial monthly payments, as the case may be, and on the basis of an assumption that the borrowers will likely be able to pay the higher monthly payments that may result from later increases in the mortgage rates or from later increases in the monthly payments, as the case may be, at the time of the increase even though the borrowers may not be able to make the higher payments at the time of origination.***  The mortgage rate in effect from the origination date of an ARM loan or other types of loans to the first adjustment date are likely to be lower, and may be significantly lower, than the sum of the then applicable index and Note Margin…

Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed March 3, 2006, at 15-16; *cf.,* Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed April 3, 2007, at 21.

140.    ***Omitted Information:***    In fact, Residential Capital instructed correspondent lenders to push certain types of mortgage loans, such as hybrid option-ARM loans, also referred to as Negative Amortization loans (*see supra*), historically reserved for only those borrowers

with outstanding credit history and sufficient income.  These hybrid loan products allowed borrowers to "pick-a-payment" for an initial period of one to five years, with the difference between what was owed and what was paid then added on to the outstanding loan amount.  In an attempt to increase the amount of loans originated, the Originators failed to disclose to borrowers that once the outstanding loan amount reached a certain level, *i.e.*, 110% of original balance, the "pick-a-payment" period ended, and borrowers would be required to make monthly payments of an even larger outstanding amount at an adjusted, and significantly higher, interest rate.  As such, HFN buried or completely omitted information regarding the option-ARM caps and rate adjustments when originating these types of loans for sub-prime or otherwise unqualified borrowers in order to increase the volume of origination of these types of loans.  This statement also failed to disclose that, when Defendants learned prior to the Offering date that a material percentage of the mortgage loans failed to comply with the guidelines, Defendants would go forward with the Offering without curing this problem or disclosing it to the Rating Agencies, investors, or the public.

141.   Residential Capital, according to the Registration Statements, also originated or purchased loans which were underwritten pursuant to certain "Expanded Criteria":

> ***Residential Funding Corporation's Expanded Criteria Program is designed for borrowers with good credit who may have difficulty obtaining traditional financing due to loan characteristics, such as a LTV ratios higher than 80%, occupancy of the mortgaged property or type of mortgaged property, or borrower characteristics such as self-employment.***

Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed March 3, 2006, at 16; *cf.,* Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed April 3, 2007, at 21.

142.   ***Omitted Information:*** As set forth herein in detail, Residential Capital failed to adhere to these criteria because loans were continuously approved for borrowers with bad credit,

high LTV or no verifiable employment whatsoever.  The public disclosures of late have revealed that mortgage lenders throughout the country engaged in fraudulent activities in order to obtain mortgages for borrowers and the fees obtained as payment – HFN being no exception.  This statement also failed to disclose that, when Defendants learned prior to the Offering date that a material percentage of the mortgage loans failed to comply with the guidelines, Defendants would go forward with the Offering without curing this problem or disclosing it to the Rating Agencies, investors, or the public.

143.   The Registration Statements also explained that Residential Capital, in reviewing the loans originated by correspondent lenders, employed an automated underwriting system which reviewed "most" of the information contained in borrower applications for determinations of whether or not to purchase individual mortgage loans for securitization:

> In recent years, the use of automated underwriting systems has become commonplace in the residential mortgage market. Residential Funding Corporation evaluates many of the mortgage loans that it purchases through the use of one or more automated underwriting systems.  In general, these systems are programmed to review most of the information set forth in Residential Funding Corporation's Seller Guide as the underwriting criteria necessary to satisfy each underwriting program.  In the case of the Expanded Criteria Program, the system may make adjustments for some compensating factors, which could result in a mortgage loan being approved even if all of the specified underwriting criteria in the Seller Guide for that underwriting program are not satisfied.

> ***In some cases, Residential Funding Corporation enters information into the automated underwriting system using documentation delivered to Residential Funding Corporation by the mortgage collateral seller.***  In this situation, each automated review will either generate an approval or a recommendation for further review.  Most approved mortgage loans will not receive any additional review of their credit components.  In the case of a recommendation for further review, underwriting personnel may perform a manual review of the mortgage loan documentation before Residential Funding Corporation will accept or reject the mortgage loan.  For most mortgage collateral sellers, Residential Funding Corporation will conduct a limited review of the mortgage loan documentation.  If that limited review does not detect any material deviations from the applicable underwriting criteria, Residential Funding Corporation will approve that mortgage loan for purchase.

58

*In other cases, the mortgage collateral seller enters the information directly into the automated underwriting system.  Mortgage loans that have been approved by the automated underwriting system, and submitted to Residential Funding Corporation for purchase may be reviewed to verify that the information entered by the mortgage collateral seller accurately reflects information contained in the underwriting documentation.*  For most mortgage collateral sellers, Residential Funding Corporation will verify the accuracy of the information with respect to a sample of that mortgage collateral seller's mortgage loans.

Because an automated underwriting system will only consider the information that it is programmed to review, which may be more limited than the information that could be considered in the course of a manual review, the results of an automated underwriting review may not be consistent with the results of a manual review.

Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed March 3, 2006, at 17; *cf.,* Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed April 3, 2007, at 22-23.

144.    ***Omitted Information:*** The above statements were misleading and omitted information relating to Residential Capital's lack of incentive to perform any review or verification of the information in the mortgage application.  Residential Capital's need for non-conforming mortgage loans in a competitive market caused it to forego any substantial review of the validity of mortgage loan applications and borrower information.  This statement also failed to disclose that, when Defendants learned prior to the Offering date that a material percentage of the mortgage loans failed to comply with the guidelines, Defendants would go forward with the Offering without curing this problem or disclosing it to the Rating Agencies, investors, or the public.

### 2.    The Prospectus Supplements

145.    The underlying loan collateral for all of the Issuing Trusts (¶¶ 29-30) was principally originated by HFN.  As set forth above, HFN is a Delaware corporation and wholly-owned subsidiary of RFC, which, in turn, is a wholly-owned subsidiary of Defendant RCC.  For

example, the Prospectus Supplement for the 2006-QO7 Certificates claims that "all of the mortgage loans in the mortgage pools were originated in accordance with the underwriting criteria of Residential Funding described under The Program in this Prospectus Supplement." RALI Series 2006-QO7 Prospectus Supplement, Form 424B5, filed September 29, 2006, at S-58. This same statement was repeated in the Prospectus Supplements for each of the Offerings.

146.    Moreover, the Prospectus Supplements all state that the underwriting guidelines, or "The Program," was "administered by Residential Funding on behalf of" RALI, the Depositor. *Id.*, at S-56.

147.    The Prospectus Supplements each similarly described the RFC underwriting guidelines, supposedly adhered to by HFN in originating the underlying mortgage loan collateral. For example, the Prospectus Supplement for the 2007-QO4 Offering stated:

> *Program Underwriting Standards.* In accordance with the Seller Guide, the Expanded Criteria Program Seller is required to review an application designed to provide to the original lender pertinent credit information concerning the mortgagor. As part of the description of the mortgagor's financial condition, each mortgagor is required to furnish information, which may have been supplied solely in the application, regarding its assets, liabilities, income (except as described below), credit history and employment history, and to furnish an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.

*Id.*, at S-54.  This same language was repeated in the Prospectus Supplements for each of the Offerings.

148.    ***Omitted Information***: These statements failed to disclose that in the origination process, borrower creditworthiness – the most fundamental qualification to obtain a mortgage loan – was largely disregarded.  Specifically, these statements failed to disclose that, prior to the Offering date, Defendants knew that their reunderwriting of samples of loans in the Offerings demonstrated material noncompliance with these underwriting standards, but Defendants did not

60

disclose this information to the Rating Agencies, investors, and the public.  Furthermore, beginning in 2006, RCC, specifically RFC and HFN, began abandoning prudent lending standards in order to "push more loans through the system."  The company's approach was to originate enough loans so that they could outrun their own delinquency rates and raise capital after GMAC's credit rating was revised to the lowest possible grade in late 2005, hindering GMAC and RCC's access to credit markets and long-term capital.  The lax controls led to the substantial increase of low-quality mortgage loans as more stress was placed on loan quantity at the expense of loan quality.

149.    The 2007-QO4 Prospectus Supplement also stated:

Based on the data provided in the application and certain verifications, if required, a determination is made by the original lender that the mortgagor's monthly income, if required to be stated, will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations.

*Id*., at S-54.  This same language was repeated in the Prospectus Supplements for each of the Offerings.

150.    **Omitted Information:** These statements failed to disclose that loan origination guidelines were largely disregarded.  Specifically, these statements failed to disclose that, prior to the Offering date, Defendants knew that their reunderwriting of samples of loans in the Offerings demonstrated material noncompliance with these underwriting standards, but did not disclose this information to the Rating Agencies, investors, and the public.   In fact, HFN did not verify the income of borrowers as represented, and was extremely liberal with terms even to borrowers with low credit scores.  Over time, HFN became heavily focused on pushing Option-ARM and hybrid products to borrowers who could otherwise not qualify for a mortgage loan.

61

Moreover, HFN's correspondent loans routinely included hidden fees and charges to borrowers who were never informed of them in the application process.

151.   The 2006-QO4 Prospectus Supplement also stated:

Certain of the mortgage loans have been originated under "reduced documentation" or "no stated income" programs, which require less documentation and verification than do traditional "full documentation" programs. Generally, under a "reduced documentation" program, no verification of a mortgagor's stated income is undertaken by the originator. Under a "no stated income" program, certain borrowers with acceptable payment histories will not be required to provide any information regarding income and no other investigation regarding the borrower's income will be undertaken. Under a "no income/no asset" program, no verification of a mortgagor's income or assets is undertaken by the originator. The underwriting for those mortgage loans may be based primarily or entirely on an appraisal of the mortgaged property and the LTV ratio at origination.

*Id.*, at S-55.  This same language was repeated in the Prospectus Supplements for each of the Offerings.

152.   ***Omitted Information***:   These statements failed to disclose that loan origination guidelines were largely disregarded.  Specifically, these statements failed to disclose that, prior to the Offering date, Defendants knew that their reunderwriting of samples of loans in the Offerings demonstrated material noncompliance with these underwriting standards, but did not disclose this information to the Rating Agencies, investors, and the public.

153.   The 2006-QO4 Prospectus Supplement also stated:

Prior to assigning the mortgage loans to the depositor, Residential Funding will have reviewed the underwriting information provided by the mortgage collateral sellers for the mortgage loans and, in those cases, determined that the mortgage loans were generally originated in accordance with or in a manner generally consistent with the underwriting standards described in the Seller Guide. With regard to a material portion of these mortgage loans, this review of underwriting information by Residential Funding was performed using an automated underwriting system. Any determination described above using an automated underwriting system will only be based on the information entered into the system and the information the system is programmed to review.

*Id.* This same language was repeated in the Prospectus Supplements for each of the Offerings.

154. ***Omitted Information***: These statements failed to disclose that loan origination guidelines were largely disregarded. Specifically, these statements failed to disclose that, prior to the Offering date, Defendants knew that their reunderwriting of samples of loans in the Offerings demonstrated material noncompliance with these underwriting standards, but did not disclose this information to the Rating Agencies, investors, and the public. Further, as set forth herein, the above statements were misleading and omitted information relating to Residential Capital's lack of incentive to perform any review or verification of the information in the mortgage application. Residential Capital's need for non-conforming mortgage loans in a competitive market caused it to forego any substantial review of the validity of mortgage loan applications and borrower information.

155. The 2006-QO4 Prospectus Supplement also stated:

> The applicable underwriting standards include a set of specific criteria by which the underwriting evaluation is made. However, the application of the underwriting standards does not imply that each specific criterion was satisfied individually. Rather, a mortgage loan will be considered to be originated in accordance with the underwriting standards described above if, based on an overall qualitative evaluation, the loan is in substantial compliance with the underwriting standards.

*Id.*, at S-58. This same language was repeated in the Prospectus Supplements for each of the Offerings.

156. ***Omitted Information***: These statements failed to disclose that loan origination guidelines were largely disregarded. Specifically, these statements failed to disclose that, prior to the Offering date, Defendants knew that their reunderwriting of samples of loans in the Offerings demonstrated material noncompliance with these underwriting standards, but did not disclose this information to the Rating Agencies, investors, and the public. Further, exceptions to guidelines were granted in many circumstances – not only where compensating factors existed

63

or substantial compliance was satisfied. The exceptions were granted when the borrower could not qualify for a mortgage loan. A substantial portion of the loans originated pursuant to the HFN/RFC Program underwriting guidelines were approved and submitted by mortgage brokers and correspondent lenders throughout the country. Thereafter, as set forth above, the loans would be evaluated using a computerized system which could not exercise any degree of realistic control over the truthfulness of the borrower information contained in mortgage applications.

157. Each of the Prospectus Supplements contained information similar to the following:

> The depositor and Residential Funding will make certain limited representations and warranties regarding the mortgage loans as of the date of issuance of the certificates. The depositor and Residential Funding will be required to repurchase or substitute for any mortgage loan as to which a breach of its representations and warranties with respect to that mortgage loan occurs, if such breach materially and adversely affects the interests of the certificateholders in any of those mortgage loans. Residential Funding will not assign to the depositor, and consequently the depositor will not assign to the trustee for the benefit of the certificateholders, any of the representations and warranties made by the sellers or the right to require the related seller to repurchase any such mortgage loan in the event of a breach of any of its representations and warranties. Accordingly, the only representations and warranties regarding the mortgage loans that will be made for the benefit of the certificateholders will be the limited representations and warranties made by Residential Funding and the depositor to the limited extent described above.

*Id.* at S-38-39. This same language was repeated in the Prospectus Supplements for each of the Offerings.

158. **Omitted Information**: These statements failed to disclose that loan origination guidelines were largely disregarded. Specifically these statements failed to disclose that, prior to the Offering date, Defendants knew that their reunderwriting of samples of loans in the Offerings demonstrated material noncompliance underwriting standards, but did not disclose this information to the Rating Agencies, investors, and the public.

64

**B.      The Offering Documents Omitted Information**
        **Regarding Delinquencies as of the Cut-Off Dates**

159.    The Registration Statements contained general descriptions of the information that would be contained in each of the Prospectus Supplements.  With regards to delinquencies of the underlying collateral as of the cut-off date, the 2006 Registration Statement stated as follows:

> As of the cut-off date, none of the mortgage loans will be 30 or more days delinquent in payment of principal and interest.

Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed March 3, 2006, at S-37; *cf.,* Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed April 3, 2007, at S-39.

160.    Each of the Prospectus Supplements contained the same or similar language as set forth above, indicating that as of the "cut-off date" (defined differently in each Prospectus Supplement) none of the mortgage loans were 30 days or more delinquent.   In addition, the Prospectus Supplements contained additional information regarding delinquencies of the underlying collateral as follows:

> ***As of the cut off date, none of the mortgage loans are currently 30 to 59 days delinquent in payment of principal and interest.*** As of the cut-off date, one of the mortgage loans representing 0.1% of the mortgage loans has been 30 to 59 days delinquent in payment of principal and interest in the past 24 months. As of the cut-off date, none of the mortgage loans are currently 60 to 89 days delinquent in the payment of principal and interest. As of the cut off date, none of the mortgage loans have been 60 to 89 days delinquent in the payment of principal and interest in the past 24 months. As of the cut off date, none of the mortgage loans are currently 90 or more days delinquent in payment of principal and interest. As of the cut off date, none of the mortgage loans have been 90 or more days delinquent in the payment of principal and interest in the past 24 months.

RALI Series 2006-QO7 Prospectus Supplement, Form 424B5, filed September 29, 2006, at S-54 (emphasis added).

161.    ***Omitted Information:*** These statements masked the true impaired nature of the collateral since the delinquency rates for these loan pools followed the same pattern of

1727624.1

skyrocketing delinquencies immediately following the Offerings.   Specifically, within four months after the respective "cut-off dates," borrower delinquency rates increased by an average of 48,500%, from 0.00% to almost 4.85% of the outstanding collateral balance, and within six months that figure further rose to over 6.55%, another 28% increase within just two months and a combined increase of approximately 65,500% from the cut-off dates.   As of April 2010, delinquency and default rates had increased to an average of over 37% for the pools underlying the Offerings at issue in this Complaint.   As of the date of the filing of this Complaint, borrower delinquency and defaults remain extremely high and are approximately 37% of the remaining pool balances.

## VI.

## <u>CLASS ACTION ALLEGATIONS</u>

162.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons or entities who acquired the Certificates issued by the Issuing Trusts, as set forth in ¶¶ 29-30 above, pursuant and/or traceable to the false and misleading Registration Statements and who were damaged thereby (the "Class").   Plaintiffs purchased pursuant to the Offering Documents.   With respect to claims under Section 11 of the Securities Act, Plaintiffs seek also to represent Class members who have acquired the Certificates traceable to the Offering Documents.

163.    Excluded from the Class are Defendants; the Federal National Mortgage Association; the Federal Home Loan Mortgage Corporation; the officers and directors of the Defendants, at all relevant times; members of their immediate families and their legal representatives, heirs, successors or assigns; and any entity in which Defendants have or had a controlling interest.

164.   The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by RCC, RFC, RALI or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  Billions of dollars' worth of Certificates were issued pursuant to the Registration Statements.

165.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

166.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

167.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are: whether Defendants violated the Securities Act; whether the Registration Statements issued by Defendants to the investing public negligently omitted and/or misrepresented material facts about the underlying mortgage loans comprising the pools; and to what extent the members of the Class have sustained damages and the proper measure of damages.

168.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

169.    The Class includes purchasers pursuant or traceable to all 41 Offerings set forth herein, since the Offerings are substantially similar and require proof of overlapping factual issues.

170.    All of the Offerings had a substantial percentage of HFN-originated loans.  The material misstatements and omissions concerning compliance with the underwriting guidelines set forth in each of the Prospectus Supplements were the same.

171.    Because the Offerings were created and issued within just over 18 months of one another, the material omissions and misstatements made in connection with one Offering were relevant to those made in connection with other Offerings.

172.    The Offerings share the same set of Defendants and concern the same course of conduct – the undisclosed systematic disregard of underwriting guidelines in origination of the loans at issue.

173.    The same personnel for each Defendant were responsible for many of the particular functions described herein relating to the creation, due diligence, and issuance of the Offerings.

## VII.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**For Violation of Section 11 of the Securities Act**
**(Against the Individual Defendants and the Underwriter Defendants)**

174.     Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

175.     This Cause of Action is brought pursuant to Section 11 of the Securities Act, on behalf of Plaintiffs and the Class, against the Individual Defendants and the Underwriters of the Offerings.   This Cause of Action is predicated upon Defendants' strict liability for making material misleading statements and omitting material information from and in the Offering Documents.

176.     The Offering Documents were materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

177.     The Individual Defendants and the Underwriter Defendants are strictly liable to Plaintiffs and/or the Class for making the misstatements and omissions in issuing the Certificates.

178.     The Individual Defendants each signed one or both of the Registration Statements.

179.     The Underwriter Defendants acted as underwriter in the sale of Certificates issued by the Issuing Trusts, directly and indirectly participated in the distribution of the Certificates, directly and indirectly solicited offers to purchase the Certificates, and directly and indirectly participated in drafting and disseminating the Offering Documents for the Certificates.

69

180.    The Individual Defendants and the Underwriter Defendants owed to the Plaintiffs and/or other Class members the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

181.    The Individual Defendants and the Underwriter Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Offering Documents as set forth herein.

182.    The Individual Defendants and the Underwriter Defendants failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that statements contained in the Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

183.    The Individual Defendants and the Underwriter Defendants issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the Offering Documents, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

184.    By reason of the conduct alleged herein, the Individual Defendants and the Underwriter Defendants each violated Section 11 of the Securities Act, and are liable to Plaintiffs and/or the Class.

185.    Plaintiffs and other Class members acquired the Certificates pursuant and/or traceable to the Registration Statements.  At the time Plaintiffs and Class members obtained their

Certificates they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

186.   Plaintiffs and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of the Individual Defendants and the Underwriter Defendants.

187.   By virtue of the foregoing, Plaintiffs and other Class members are entitled to damages, jointly and severally from the Individual Defendants and the Underwriter Defendants, as set forth in Section 11 of the Securities Act.

188.   This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents and within three years of the Certificates being offered to the public.   Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

## SECOND CAUSE OF ACTION

### For Violation of Section 12(a)(2) of the Securities Act
### (Against the Underwriter Defendants)

189.   Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

190.   This Cause of Action is brought pursuant to Section 12(a)(2) of the Securities Act, on behalf of Plaintiffs and the Class, against the Underwriters of the Offerings.

191.   The Underwriter Defendants promoted and sold the Certificates pursuant to the defective Prospectus Supplements for their own financial gain.   The Prospectus Supplements contained untrue statements of material fact, omitted to state facts necessary to make statements not misleading, and concealed and failed to disclose material facts.

71

192.    The Underwriter Defendants owed to Plaintiffs and/or the other Class members who purchased Certificates pursuant to the Offering Documents a duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents, to ensure that such statements were true and that there was no omission of material fact necessary to make the statements contained therein not misleading.

193.    The Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Offering Documents, as set forth herein.

194.    Plaintiffs and other Class members purchased or otherwise acquired Certificates pursuant to and/or traceable to the defective Offering Documents.  Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of the misrepresentations and omissions contained in the Offering Documents.

195.    By reason of the conduct alleged herein, the Underwriter Defendants violated Section 12(a)(2) of the Securities Act, and are liable to Plaintiffs and/or other Class members who purchased Certificates pursuant to and/or traceable to the Offering Documents.

196.    Plaintiffs and/or other Class members were damaged by the Underwriter Defendants' wrongful conduct.  Those Class members who have retained their Certificates have the right to rescind and recover the consideration paid for their Certificates, as set forth in Section 12(a)(2) of the Securities Act.  Those Class members who have sold their Certificates are entitled to rescissory damages, as set forth in Section 12(a)(2) of the Securities Act.

197.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents, and within three years of when the Certificates were sold to the public.  Despite the exercise of reasonable diligence, Plaintiffs could

72

not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

## THIRD CAUSE OF ACTION

**Violations of Section 15 of the Securities Act
(Against the Individual Defendants and the Underwriter Defendants)**

198.     Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

199.     This Cause of Action is brought pursuant to Section 15 of the Securities Act against the Individual Defendants and the Underwriter Defendants.

200.     Each of the Individual Defendants, by virtue of his or her control, ownership, offices, directorship, and specific acts set forth above was, at the time of the wrongs alleged herein, a controlling person of RCC, RFC, RALI and the Issuing Trusts within the meaning of Section 15 of the Securities Act.  Each of the Individual Defendants had the power to influence, and exercised that power and influence, to cause RCC, RFC, RALI and the Issuing Trusts to engage in violations of the Securities Act, as described above.

201.     The Underwriter Defendants, by virtue of their control, influence, participation and solicitation of offers to purchase the Certificates and specific acts set forth above were, at the time of the wrongs alleged herein, controlling persons of RCC, RFC, RALI and the Issuing Trusts within the meaning of Section 15 of the Securities Act.  The Underwriter Defendants had the power to influence, and exercised that power and influence, to cause RCC, RFC, RALI and the Issuing Trusts to engage in violations of the Securities Act, as described above.

202.     The Individual Defendants' and the Underwriter Defendants' control, position and influence made them privy to, and provided them with actual knowledge of, the material facts and omissions concealed from Plaintiffs and the other Class members.

73

203.    Each of the Individual Defendants was a participant in the violations alleged herein, based on their having prepared, signed or authorized the signing of the Registration Statements and having otherwise participated in the consummation of the Offerings detailed herein.   The Defendants named herein were responsible for overseeing the formation and operation of the Issuing Trusts, including routing payments from the borrowers to investors.

204.    Individual Defendants prepared, reviewed and/or caused the Registration Statements and Prospectus Supplements to be filed and disseminated.

205.    Since the Defendants named herein controlled the ultimate decision of which mortgage loans would be included and excluded from the securitized pools of loans as well as the ultimate amount of credit enhancement required in order for the Certificates to be sold to investors, they controlled all material aspects relating to the acquisition, structure and sale of the Certificates and thus, the activities of the Issuing Trusts and Individual Defendants within the meaning Section 15 of the Securities Act.

206.    By virtue of the wrongful conduct alleged herein, the Individual Defendants and the Underwriter Defendants are liable to Plaintiffs and the other Class members for the damages sustained.

## VIII.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Plaintiffs as Class representatives;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of

Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.      Awarding rescission or a rescissory measure of damages; and

E.      Awarding such additional equitable, injunctive or other relief as deemed appropriate by the Court.

75

## JURY DEMAND

Plaintiffs hereby demand a trial by jury

Dated: New York, New York
       May 10, 2013

Respectfully submitted,

**COHEN MILSTEIN SELLERS & TOLL PLLC**

By: _____
       Joel P. Laitman
       Christopher Lometti
       Richard Speirs
       Michael B. Eisenkraft
       Daniel B. Rehns
       Kenneth M. Rehns
88 Pine St., 14th Floor
New York, New York 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
jlaitman@cohenmilstein.com
clometti@cohenmilstein.com
rspeirs@cohenmilstein.com
meisenkraft@cohenmilstein.com
drehns@cohenmilstein.com
krehns@cohenmilstein.com

       Steven J. Toll *(pro hac vice)*
       Julie Goldsmith Reiser *(pro hac vice)*
       Joshua S. Devore *(pro hac vice)*
       S. Douglas Bunch
1100 New York Ave. N.W., Suite 500 West
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
stoll@cohenmilstein.com
jdevore@cohenmilstein.com
jreiser@cohenmilstein.com
dbunch@cohenmilstein.com

*Lead Counsel for Plaintiffs New Jersey Carpenters*
*Vacation and Health Funds, Boilermaker*
*Blacksmith National Pension Trust, IPERS,*
*OCERS and Midwest OE and the Proposed Class*

*-and-*

Robin F. Zwerling
Jeffrey C. Zwerling
Justin M. Tarshis
**ZWERLING, SCHACHTER &
ZWERLING, LLP**
41 Madison Avenue
New York, New York 10010
Telephone:  (212) 223-3900
Facsimile:  (212) 371-5969
rzwerling@zsz.com
jzwerling@zsz.com
jtarshis@zsz.com

*Counsel for the Police & Fire Retirement System of
the City of Detroit*

## CERTIFICATE OF SERVICE

I, Michael Eisenkraft, counsel for the Plaintiffs, hereby certify that on May 10, 2013, I filed an original of the foregoing by hand with the Clerk of the Court under seal and delivered a copy to counsel of record for all parties in the within action by electronic mail.

Michael Eisenkraft